No. 34,163

STELLA M. BRENN, Widow of Harry M. Brenn, Deceased, and STELLA M. BRENN, Guardian of DOROTHY BRENN et al., Minors (Claimant), *Appellee,* v. CITY OF ST. JOHN (Respondent), *Appellant.*

(87 P. 2d 546)

Opinion filed March 4, 1939.

*Robert Garvin, Evart Garvin* and *Morris Garvin,* all of St. John, for the appellant.

*James L. Galle, R. O. Mason,* both of McPherson, and *William Davison,* of St. John, for the appellee.

The opinion of the court was delivered by

THIELE, J.: This was a proceeding under the workmen's compensation act.

The city of St. John owns and operates an electric light, power and distribution system. Harry Brenn, who had been an employee, was electrocuted on March 18, 1937. He left surviving his widow and five children, then minors of the following respective ages: 17, 15, 14, 12 and 5 years. No guardian was appointed until November 19, 1937, when the mother was appointed, and within a few days she filed a claim for compensation on behalf of her wards, but not individually. After a hearing before the commissioner, an award was made on May 7, 1938, in favor of the children, and an apportionment made, as the eldest child had been married in the meantime. The city appealed to the district court, which found that the claim for compensation on the part of all children except the youngest was not made within the statutory period. In other respects, it approved the findings of the commissioner, and ordered the entire award paid to the youngest child, part in a lump sum and part in installments. The city appeals.

·The city presents, first, two questions which are argued together. Did the relationship of employer and employee exist at the time of the fatal accident? and, Did the accident arise out of and in the course of the employment? Insofar as the question turns on facts, our inquiry is limited to determining whether the conclusions of the district court are supported by the evidence.

About one mile south of the south city limits, and on property owned by what is referred to as the Asher estate, was an establishment known as Asher Cabin Camp. Sometime prior to the accident, and at the expense of the Asher estate, a line of poles was built from the city limits to the camp. On this line of poles were electric-light lines carrying an electric current of 2,300 volts. The meter for this line was at the city limits. On the same line of poles was a telephone wire or wires leading to the camp. This pole line paralleled highway No. 8. In connection with improving that highway, a construction foreman desired electric service for a trailer house in which he was to live. This house was about one-half mile south of the city limits. By agreement with the Asher estate, a transformer was placed on a pole near by and this house was served with electricity. This use terminated and the service was cut off, but the transformer was never disconnected. Although there is dispute in the exact method employed to collect, there is no doubt the city was paid for the electricity used by the construction foreman.

On March 18, 1937, there was some trouble along the telephone line and an employee of that company asked Brenn to go with him to disconnect the transformer. In attempting to disconnect the transformer Brenn was killed. The gist of appellant's argument is that when Brenn went outside the city limits to assist the telephone company by disconnecting the transformer, he temporarily left his employment, and that at the time of the accident Brenn was working for the sole benefit of the telephone company; that the city was under no obligation to do any work upon the Asher high line, which had been contracted and paid for by the Asher estate, and the accident did not arise out of and in the course of Brenn's employment with the city. Stated in another way, appellant contends that Brenn voluntarily left his employment with the city to perform an act for the telephone company in which the city had no interest. It may be conceded there was evidence, either direct or from which it might be inferred that such was the case. But there was evidence which supported the findings and conclusions of the commissioner and the dis-

trict court. To begin with, the field of the city's activities was not confined to the city. On the morning of the accident Brenn had been directed by his superior to get materials ready for use on a substation at Dillwyn, which is about seven miles from St. John. He had previously been sent out to work on a line between Seward and St. John. Brenn was a lineman and trouble shooter and was supposed to take care of trouble complaints without knowledge of or orders from his superior. One of the members of the city council stated:

"It was Mr. Brenn's duty to take care of transformers, meters and poles in the city limits for the city. It would have been one of Mr. Brenn's duties as lineman to go out there and cut that meter if it belonged to the city. It was also the duty of the lineman to go out and get wires, whether in the city limits or out of the city limits, that belonged to the city."

Although the city did not own the line to the Asher camp, in order to supply the construction foreman, it arranged for its use, the installation of its own transformer, meter, wires, etc., to serve him and was paid therefor, and at the conclusion it discontinued to serve, leaving its transformer hanging on the pole and connected to the highline. When the telephone lineman told Brenn he could not work on his line because of the condition, Brenn went to remedy it and met his death. The above statement is not intended to include every part of the evidence from which it may be deduced that Brenn was carrying on the duties which he was expected to perform when he went to disconnect the transformer.

The city's argument in part leads to the conclusion that had the transformer been within the city, it would have been liable, but that when Brenn went without the city limits, he abandoned his employment with the city. The argument in part is that what Brenn did was for the telephone company and not for the city, hence did not arise out of and in the course of his employment with the city. Although the city did not own the highline, it did for a purpose use it, and when that use was ended it did not entirely remove its property. We are not now concerned with its possible liability to some third party who might have sustained injuries by reason of the dangerous situation. The same pole line carried the telephone company's wires, and when its lineman discovered he could not make repairs because of a dangerous situation, he notified Brenn, the trouble shooter for the city. It was the city's transformer which created the dangerous situation, not the Asher lines. Brenn is dead, so we do not have his explanation, but from the evidence it is plainly inferrable that he

undertook to remedy a dangerous condition created by the city in not disconnecting the transformer.

The same contention made here was considered in *Fairchild v. Prairie Oil & Gas Co.*, 138 Kan. 651, 27 P. 2d 209, where an analogous state of facts was involved and where it was held:

"Where an employee receives injuries while employed where he may reasonably be while performing his usual duties or other acts incidental thereto, which other acts are fairly connected with, and, in the judgment of the employee, are for the protection of the property and for the benefit of the business of the employer and are not so foreign to his usual duties as to amount to an abandonment thereof, such injuries are sustained in and arise out of his usual course of employment." (Syl. ¶ 1.)

We conclude that the finding of the district court that Brenn had not abandoned his employment at the time of his death and that the accident causing it arose out of and in the course of his employment with the city, is supported by the evidence.

The city further contends the claim for compensation was not made as required by law, the point urged being there was no evidence the five-year-old child was incompetent, either physically or mentally, and that claim in her behalf was therefore too late. (See G. S. 1935, 44-509, 44-520a.) The city cites no authorities in support of its contention. The district court found that by reason of her tender years, the child was mentally incompetent to make claim. This court had the same question before it in *Baxter v. Chicago, R. I. & P. Rly. Co.*, 139 Kan. 443, 449, 32 P. 2d 451, where it was said:

"The statute provides that when a claimant is mentally incompetent at the time when any right, privilege or election accrues to him, his guardian may on his behalf claim and exercise such right, privilege or election, and no limitation of time in this act provided for shall run so long as such incompetent has no guardian. (R. S. 1933 Supp. 44-509, Laws 1927, ch. 232, § 9.) A baby of such tender years, as all know, has not developed into competency and need not be insane to come within the excepted class. The law generally affords infancy protection, and it is needless to argue that a twenty-months-old baby is competent to care for legal rights, including the making of claims for compensation. Within the meaning of the act the baby was mentally incompetent, and the shifting of the word minor did not render her incompetent. Mental incompetency does not have to arise from mental disease. It may arise from a lack of development as well as from a diseased mind, and in either case the baby was within the excepted class. (See *Minturn v. Manufacturing Co.*, 102 Kan. 885, 172 Pac. 17.)" (p. 449.)

It is to be observed there was considerable difference in the ages of the claimant in that case and in the case before us. Under the statutes, delay is excused where the defendant is mentally incom-

petent. There is no age test, and the question of when an infant may be said to be no longer mentally incompetent does not admit of a ready answer. Our statute with respect to witnesses states that children under ten years of age who appear incapable of receiving just impressions of facts respecting which they are examined or of relating them truly are incompetent to testify (G. S. 1935, 60-2805, Second). This is some recognition that children under ten years of age may not be fully mentally competent. Under that statute, it would appear that the qualification of a witness is to be determined by his intelligence and not by his age alone. (See *Devine v. Heckman,* 121 Kan. 22, 245 Pac. 1037; *O'Connell v. Lusk,* 122 Kan. 186, 250 Pac. 1059.) It would seem that a child of five years of age would, prima facie, be said to be mentally incompetent to make a claim for compensation under the act, and if the employer thought otherwise the burden would be on him to prove the fact.

At the hearing before the commissioner there seems to have been no evidence as to the mental competency of any of the minors, but the commissioner in effect found that the minors, being under the age of eighteen, having no knowledge of their legal right, and because of their tender years were mentally incompetent under the statute. If that were the intention of the legislature, much more appropriate language would have been used in the statute, and this is especially true when the provisions of the former workmen's compensation act are considered. (See R. S. 1923, 44-509.) In the absence of any showing to the contrary, we think the district court properly held the four children twelve or more years old were not mentally incompetent under the statute. Insofar as the child of five years is concerned, we are of opinion the district court also ruled correctly.

The city directs our attention to G. S. 1935, 44-510, paragraph (2), subdivision (c), and contends that the district court erred in awarding to the youngest child the entire amount of the award, contending, in effect, that the child was entitled to only one-fifth thereof. The question is settled by *Baxter v. Chicago, R. I. & P. Rly. Co.,* 141 Kan. 527, 41 P. 2d 999. Without reviewing that case, it may be said the district court did not err in its ruling.

And finally, the city complains against the allowance of $150 for funeral expenses for the reason there was no showing of the amount or that the funeral expenses were paid by the claimants or any of them. The claimant answers that under G. S. 1935, 44-510, para-

graph (2), subdivision (d), the employer "shall," not "may," pay the reasonable funeral expenses not exceeding $150, and that no affirmative proof is necessary. With this we cannot agree. In a workman's compensation case the burden is on the claimant, and he must prove the various elements that together show his right to an award. We cannot assume that funeral expenses will always amount to $150, nor is the language of the statute such that it can be said claimant is entitled to an allowance of that specific amount; the statute says the employer "shall pay the reasonable expenses of burial not exceeding one hundred fifty dollars ($150)." The language used is similar to that in the first part of G. S. 1935, 44-510, with respect to furnishing medical services. In *Orozco v. Central Coal & Coke Co.*, 121 Kan. 690, 249 Pac. 604, it was held the allowance for medical services must be based on evidence. In the case before us there was no evidence as to the amount of the burial expenses or that the successful claimant paid, contracted to pay or was in any manner liable for them. She is the only one who would be entitled to such an allowance, had a proper showing been made. That showing not having been made, the district court erred in making the allowance.

The judgment of the district court is modified by striking from the award the allowance of $150 for funeral expenses. In all other respects it is affirmed.