No. 36,841

ANNA PHYLLIS McMILLIN, a Widow, and Guardian of STEPHEN FRANCIS, DONALD JOSEPH, and JOHN PATRICK McMILLIN, Minors, *Appellees,* v. CITY OF SALINA WATER DEPARTMENT (Respondent), and MARYLAND CASUALTY COMPANY (Insurance Carrier), *Appellants.*

(184 P. 2d 201)

OMER D. SMITH, judge pro tem. Opinion filed September 2, 1947.

*Richard Jones,* of Wichita, argued the cause, and *A. W. Hershberger, J. B. Patterson, Enos E. Hook* and *Wm. P. Thompson,* all of Wichita, were with him on the briefs for the appellants.

*D. E. Watson,* of Salina, argued the cause for the appellees.

The opinion of the court was delivered by

HARVEY, C. J.: This was a workmen's compensation case. The claimants are the widow and minor children of the workman, M. A. McMillin. It was stipulated the workman died February 28, 1946; that on February 5, 1946, he was employed by the respondent; that the parties were governed by the workmen's compensation act; that the Maryland Casualty Company is the insurance carrier; that claim for compensation was made within the time provided by law; that the claimants were wholly dependent upon the workman, and if they are entitled to recover anything they are entitled to recover the maximum benefits under the law; that no compensation, medical benefits or funeral expenses have been paid by respondent, and that certain items of that character have been paid by the claimants, the amount of which was stipulated. It was further stipulated that the questions in issue were: (1) Whether the required notice of accident was given respondent, and if not, whether respondent was prejudiced by the failure to give such notice; (2) whether the workman met with personal injury arising out of and in the course of

his employment, as alleged in the claim; and (3) if so, whether his death resulted from such accident. The trial court found the controverted issues in favor of claimants and made an award in accord therewith. The respondent and insurance carrier have appealed.

The record discloses that McMillin did not give notice to his employer of his accidental injury, relied upon by the claimants, within ten days, as required by G. S. 1935, 44-520. However, the statute contains this proviso:

"That want of notice or any defect therein shall 'not be a bar unless the employer prove that he has been prejudiced thereby."

Early in the hearing before the commissioner, counsel for respondents recognized that the burden was upon them to prove prejudice if they relied as a defense upon lack of notice of the accident. They offered no evidence of consequence on that point. It was not further referred to in the hearing before the commissioner nor in the district court, and respondents in this court make no contention that the plaintiffs are barred for the lack of such notice. The point needs no further discussion.

In this court appellants contend that the record contains no substantial, competent evidence to prove (a) that decedent experienced an accident; (b) that he suffered personal injury as a result of the alleged accident; or (c) that his death resulted from the alleged accidental personal injury. These contentions present questions of law as distinct from questions of fact, which this court may pass upon. (G. S. 1935, 44-556.) In doing so the court does not weigh the evidence. That was the function of the trial court. This court examines the record only to determine whether there was substantial, competent evidence to support the findings of the trial court upon these points, and in doing so considers the evidence favorable to the holding of the trial court, disregarding that which tends to the contrary. (See *Burk v. American Dist. Tel. Co.*, 160 Kan. 519, 163 P. 2d 402, where the earlier cases are cited.)

Since much of the same evidence pertains to the question of whether plaintiff sustained an accident and sustained personal injury as a result of the accident we will consider those questions together, and the evidence relating thereto may be summarized as follows: Mark A. McMillin had been an employee of the city of Salina, in the service division of its water department, for about twenty years. Luther Jordan had been employed in the same service about twenty-seven years. The two worked alone or together,

as the work required. Miss Lois Todd was in charge of the office and kept the service records of the men in the service division. Prior to December, 1945, McMillin had consulted a physician for no illness more serious than a cold and had not lost a day of work because of illness.

On December 26, 1945, he laid off work because he was not feeling well and consulted Doctor Schaefer, a reputable physician in the general practice at Salina. The doctor testified:

"At that time he complained of indefinite chest pains, indefinite abdominal pains; he was very nervous, irritable, had a slight cough, and he felt tired, weak, and unable to work."

The patient thought he had heart trouble of some character. The doctor gave him a fairly complete general physical examination, but made no definite diagnosis. Due to his cough the doctor thought he had a little cold, and since he could find no growth or organic trouble he put him under observation and watched him. This continued until January 11, 1946, when the doctor had him go to the hospital for further study, including X rays. This was done because the patient "was not making any progress, or doing any better." On January 14 the doctor testified that—

". . . due to his indefinite chest symptoms we got an X ray of his chest. Due to his indefinite gastro-intestinal symptoms, we had a barium meal on his gastro-intestinal system. Examination of the X-ray plate at that time leads to the belief that there was not anything seriously or organically wrong in that chest. Definitely not, as far as the lung parenchyma itself was concerned. I mean there was not any evidence of residual trouble as we find sometimes from a chronic cold abscess, or fluid, or particularly enlarged peribronchial lymph glands, anything like that. In fact, we didn't think there was anything wrong with that chest. The barium meal of his stomach at that time left us in doubt whether some defect he had at the pylorus was a true ulcer, or whether it might be a spastic deformity due to a spastic condition, of his general condition, which might cause a spastic condition of his pylorus. He had a lot of symptoms suspicious of an ulcer, but he was highly nervous, very irritable, and consequently it was in doubt; but we felt even so that if he did have an ulcer it certainly was not giving him excessive irritability, nervousness, indefinite chest pain, aches, that he was complaining of. We kept him in the hospital until the 17th of January, at which time we sent him home on a smooth diet, antispasmodics, and some sedatives. He went home, and seemed to do better for awhile. He seemed to improve. He seemed to feel better. He ate better, although he objected to that type of a diet. We watched him along until about the first of February. At that time he was in again. We checked him over. His general condition was apparently good. His hemoglobin was 90 per cent. His red count was five mil-

lion. We gave him a little more to eat, but there was still something indefinite about the man that we couldn't exactly put our fingers on."

Mrs. McMillin prepared the diet outlined by Doctor Schaefer, which included milk, eggnog, cereals and vegetables, with six feedings a day. McMillin rested about home, ate heartily, slept well, and by about February 1 he had gained eight pounds. Most of his pain had ceased, he was feeling much better, and was anxious to get back to work. He and his wife saw Doctor Schaefer and by reason of his improvement the doctor told him it might be beneficial for him to do some work, but to continue his diet and to rest as much as possible.

On February 4 McMillin returned to work. Jordan saw him that day and was asked:

" 'Did he seem to be in good spirits, or felling pretty good as far as you noticed?' He answered: 'He didn't seem quite like he was; nothing so out of the way with him.' "

When he came home that evening he told his wife he felt fine. He ate a good supper, as was his custom since he had been on the diet, and apparently had a good night's sleep. He was feeling well the next morning, ate a hearty breakfast and went to his work. At the office he was given a card to "turn-on" the water at meter box No. 519 on W. Prescott street. The card was later returned with his initials, indicating he had performed the work. Shortly before ten o'clock that morning he went home and from the door called his wife and asked her to bring him clean overalls. She went to the door and saw that his overalls were wet and muddy. They were torn at both knees. When he went to work that morning they were clean and not torn. She asked him what had happened and he said:

"He had slipped getting a reading, and he wanted to change his clothes—getting a reading on this meter. And I asked him if he hurt himself, because he was looking bad and feeling bad, he said he didn't know, but his arm hurt awful bad. . . . He was very pale, and he looked as though he had aged ten years."

Later in the morning she asked him about it and "He said it was a meter box." At another time he said, "I must have hit this shoulder when I slipped in the meter box." An adult daughter, Mrs. Robinson, was present and heard a part of the conversation between Mr. and Mrs. McMillin and testified: "He says he fell in a manhole, the meter box." She noticed that her father was pale and weak, that he seemed to have no enthusiasm, which was different than she had always known him.

He rested awhile and went back to work. He came home at noon. Mrs. McMillin testified:

"He just looked like a sick man, very sick, and couldn't stand up straight. He didn't want his meal, but he ate part of it. And he was complaining of his shoulder then at noon, hurting him awful bad."

He ate but little of his lunch and lay down on his bed until one o'clock, a thing he had never been known to do before. He then went back to his work, but returned about four o'clock, very tired and complaining of pain in his arm and of some pain in his chest. He lay down for awhile, but got up and ate a very little and retired about six o'clock in the evening, his usual retiring time being nine o'clock or later. His wife telephoned the doctor and related his condition and said something about his having had a fall. The doctor prescribed for him over the telephone. The next morning when he got up he was still weary and weak, ate but little breakfast, then went to his work. He told his fellow-workman Jordan that he didn't know whether he could make it, and Jordan volunteered to do the outside work that day. Miss Lois Todd saw him in the office about noontime and testified:

"He looked as though he could hardly stand up, and he took hold of the counter and, said he didn't believe he would be able to make it, and one eye was drooped quite a little, it hadn't been before, one eyelid."

He went home to lunch, but ate very little and lay down again until one o'clock. His chest pains were getting worse and the pain in arm and shoulder continued. His wife wanted him to stay at home and rest, but he said there was so much to do in the basement that he thought he should go back to work; that he could sit down and help out. About two o'clock he told Jordan that he could not stand it any longer and asked Jordan to take him home. Jordan was asked:

" 'What did you observe about his actions there that afternoon when he left work?' He answered: 'He just said he couldn't make it, his chest was hurting him awful bad, and he was just weaving toward me, and he said he wanted me to take him home.' "

Jordan took him home and he went to bed. He looked bad and was coughing, and said: "Just let me rest."

Later in the evening he drank a glass of milk and ate a little which his wife took to him while he was in bed. She called the doctor and told him her husband was not getting any better and what had happened. The doctor said he would check through the X ray

again, and about an hour later he called and said "there was nothing wrong there, nothing wrong with his chest, not that he could see." After that McMillin was confined to his bed except to go to the bathroom. He took all his meals in bed, which consisted of a glass of milk, some Jell-O, or crackers, or eggnog, never a full meal. The doctor saw him on the evening of February 9.

"He prescribed some more tablets, but Mark was coughing real hard and spit up blood. The Doctor still thought it was a cold."

His condition grew gradually worse.

Luther Jordan, called as a witness for claimants, testified that he had worked for the city water department for 27 years as a service man and was well acquainted with M. A. McMillin; that sometimes the two worked together and sometimes alone; that he was familiar with the meter box at 519 W. Prescott street and described it as being situated in the parking and to consist of a meter pit about 3½ feet deep, 18 inches in diameter, constructed of tile, on the bottom of which was the meter, which is about three inches in diameter; that in turning on the water it is necessary to start the meter and read it and perhaps to clean it; that to do so it would be necessary to take the screws off the small meter box, which is 34 inches below the surface of the ground, and also off the bottom of it, which is 37 inches below the surface, and to clean out the meter box and start the meter; that in doing so a workman would have to get both arms and his head and shoulders in the meter pit and after he had finished his work in there to put one hand near the bottom, push himself up as far as he could and get the other hand out to the surface and pull himself out of the meter pit, and that sometimes a workman slipped in doing so. Counsel for respondents was objecting to this evidence and counsel for claimants explained that since there was no eyewitness to what occurred they were attempting to prove what the facts were by the circumstances and by what was necessary to be done. Answering a question the witness testified to the fact that McMillin, when he was out on a job, generally got it done, and the following occurred:

Counsel for respondents: "Object to the answer and ask it be stricken. Nobody denies he was working."

Counsel for claimants: "If you admit he was on duty at the time we allege—"

Counsel for respondents: "I will admit that. I will not dispute it. I don't think there is any use arguing about it."

We think the evidence above set out shows there was an abun-

dance of substantial, competent evidence, to support the findings of the trial court to the effect that McMillin, on February 5, 1946, sustained an accident arising out of and in the course of his employment and that he suffered personal injuries as a result of such accident.

Appellants contend that there is no competent evidence that Mc-Millin died as a result of such accident and injuries. In their brief they regard this question as the "crux of this case." In addition to the evidence previously stated the evidence bearing upon this point may be summarized as follows: The evening of February 6 Mrs. McMillin called Doctor Schaefer and told him what had happened, that McMillin had slipped getting a reading and that he had pains in his arm and in his shoulder and that "his chest was hurting pretty bad. I thought he hurt himself pretty bad, . . . he was coughing pretty hard, too." The doctor said, "No, it was just a cold." He sent out some tablets and told Mrs. McMillin to put heat on his chest, a hot water bottle or dry heat, and to rub his arm and shoulder with alcohol, which she did. The next morning McMillin was stooped over and pale and complained particularly of chest pains, which were getting worse. The next day Mrs. Mc-Millin called the doctor and said McMillin was not getting better. The doctor said he would check into the X ray again and see if he could find anything, and later the same day he called and said he had done so, and said "there was nothing there, nothing wrong with his chest, not that he could see." The doctor called upon the patient the evening of February 9 and "thought he probably was catching more cold in his chest, because he had more cough and more of these indefinite chest pains and discomforts which we were indefinite about." The doctor then changed the medicine. "He prescribed some more tablets, but Mark was coughing real hard and spit up blood. The doctor still thought it was a cold." The cough was worse when he sat up. This treatment continued, with some variations, with the patient showing no improvement, but gradually getting weaker. Mrs. McMillin took his temperature every day at four o'clock and found it substantially normal.

Earl Crawford, an employee of respondent, went to see McMillin about the middle of February and observed that he was downhearted, nervous, rather pale, and had lost weight. At that time he complained of pain in his chest. On February 21 Doctor Schaefer saw McMillin and examined his chest with a fluoroscope.

"Then we found a mass in the chest corresponding to the level of the aortic arch, and we made diagnosis of either aneurysm or possibly malignancy of the mediastinum. . . . So in order to be a little more positive about it we again sent him to the hospital for an X ray, which is more detailed of course than a fluoroscope examination. And he went to the hospital on either the 25th or 26th of February, at which time we had an X ray of the chest and we felt then on examining this X ray he had definitely had an aneurysm of the arch of the aorta, so he remained in the hospital. This was the 25th; . . . he was under observation again and I felt . . . if this was an aneurysm our hands were tied and there was not anything we could do."

The doctor had made no definite diagnosis of McMillin's trouble until after the examination of the X ray taken February 25. He advised Mrs. McMillin the result of this examination. "He said he was severely ill, nothing he could do for him."

An aneurysm was described by the doctor as a "bulge" in the aorta, which indicated a deterioration or partial break of the muscular wall of the aorta, and illustrated it by comparing it to a bulge that might be produced in the inner tube of an automobile tire which was inflated and the wall of the tube had a weak spot which the air pushed out to form a bulge. Doctor Schaefer had a test for syphilis made by the state board of health, which showed negative. McMillin died suddenly the morning of February 28. Doctor Schaefer had left town. There was no post-mortem examination. The certificate of death recited that death resulted from a bursted aneurysm of the aorta, the basic cause being syphilis. Doctor Schaefer did not sign the death certificate and had never seen it. He said the basic cause of the aneurysm had been forming for a long time, that the aneurysm such as was disclosed by the X ray eventually would result in death, if there were no intervening cause of death, in one of two ways—the bulge would ultimately burst, or a blood clot would form in it which would pass into the blood stream as an embolus to the brain, lungs or heart, resulting in death. Which way the death occurred in this case could not be determined since there was no post-mortem.

Doctor Schaefer was asked a hypothetical question embodying the substance of much of the testimony given, including that of the witness Jordan, as to the work McMillin did on February 5, including a description of the witness Jordan as to how that would have to be performed, and was asked to give his opinion as to whether that could have aggravated McMillin's previous condition so as to hasten his death on February 28, and replied: "I think that

would be reasonably possible, . . . in other words, exertion, he could have aggravated the condition." Other portions of his testimony were to the same effect. He was asked if he could tell how much that might have hastened McMillin's death. He said, "No. Except the two X rays"; that is, the one taken of the chest on January 14, which did not show the aneurysm, although the basic cause of it was no doubt present, and the one taken on February 25, which showed the aneurysm. Doctor Schaefer made no pretense of being an expert on aneurysms; a doctor in this country sees so few of them. His testimony pertaining to them was given from the pathology.

Doctor Brungard, a regularly licensed physician and surgeon engaged in the practice of medicine in Salina for more than thirty years, called as a witness for claimants, testified he was the physician for M. A. McMillin's parents for about thirty years and for M. A. McMillin and his family since his marriage until March or April, 1945, and was positive that there was no evidence of syphilis in any member of the family, and that up to March, 1945, there was nothing wrong with the heart or circulatory system of M. A. McMillin. He gave it as his judgment that an aneurysm in the aorta may be caused in a normal person, free from disease, purely by heavy strain or extreme exertion. He was handed the picture of the X ray taken January 14 and stated that it showed the chest was normal for a man of his age, that the picture suggested nothing that would tend to show that the person would not live a normal life for many years thereafter. He examined the picture of the X ray taken February 25 and stated it showed a bulge in the aorta not far from where it comes out of the heart. It was an exaggerated, enlarged bulge. Comparing the two pictures he stated he would not have expected to find the aneurysm shown in the later picture in the normal life of a man whose chest showed the earlier picture.

"The aneurysm is caused to show that way by exertion ordinarily. . . . It is a strain that is the exciting cause of these things irrespective of what your primary cause is. . . . It is a weakness there, and that weakness (snapping fingers) comes into place whenever you have that exertion."

He illustrated this by comparing it to an automobile tire which, though weak, could be used safely at twenty miles per hour, but which would blow out at seventy miles per hour.

"Q. In your opinion then, if a man would have an aneurysm and he had an unusual strain it would be at least aggravated? A. It's liable to blow out, yes. . . .

"Q. If he hadn't had this accident, or a similar accident, would not he have lived a normal span of life? A. I think so. . . .

"Q. You stated that an extreme exertion or shock or exercise, would cause an aneurysm, or aggravate it? A. I will say exciting cause, yes. Aggravate, yes; that's right; exciting cause. . . .

"Q. If a man has severe or extreme exertion or strain, does that cause extra strain on the aorta? A. It is bound to cause it on the aorta, because of the mechanics of the thing, because the first artery off of the heart is the aorta, and the blood is pumped into the aorta by the ventricles, the two lower chambers, and of course in exertion there, you just push it up. The first one, that catches. That is the first artery, the largest artery in the body, and it comes out of the heart.

"Q. If a man has a fall on his chest, or a thrust, would that tend to aggravate a condition of aneurysm? A. It could. Not as much as that other, I think. A fall, anything like that, if you get to the thing, to hurt it, if you fall on the chest, and hurt the ribs, usually you ordinarily don't get deep enough, but it is the strain, the contraction, the contraction of the ventricles that pushes that thing up there and that is the first thing that catches it."

He was asked if a person was likely to have pain immediately or later and stated:

"I think that varies. I am not expert enough to state that. It is the nerve that causes the pain. It is not the artery."

He expressed the opinion that there might be more than one cause for the weakness of the walls of the blood vessels. He testified that if blood were taken from a patient and examined by the Kahn and Comer test and showed negative, "You haven't got syphilis"; that the Wasserman test was not quite so accurate. A sound artery is not likely to develop an aneurysm from an ordinary strain. Asked a series of questions which brought out some of the principal points of the testimony pertaining to McMillin's injury and the method of doing the work, as testified to by Jordan, he was asked:

"Could that cause an aneurysm or aggravate preëxisting aneurysm? A. It could aggravate it. I don't know whether that would be just the cause of it."

The exertion and the mental strain would cause the heart to beat faster, to pump fast, and the brunt of that first would be on the aorta. Usually an aneurysm, or the condition which is likely to produce it, gets progressively worse. The best treatment for it is absolute rest. The coughing and spitting up of blood from the lungs could have come from a leakage of the aorta. Examining pictures of the X rays the doctor stated it was his opinion that it would have to be a heavy strain at some time between the dates these X rays were taken for the bulge in the aorta to have de-

veloped. The X ray would not show a weakness of the wall, but it would show an enlargement. The developing aneurysm could have caused the coughing.

While the medical witnesses who testified disclaimed being experts on aneurysms, their testimony, as it applied to the facts disclosed by the evidence, was in harmony with the leading medical authorities upon the subject. In Sajous's Analytic Cyclopedia of Practical Medicine (10th Rev. Ed. Vol. 1, pp. 650 to 670) the subject is treated by Babcock. We quote or summarize a few statements from this: Aneurysm of the aorta represents the cause of mortality in one-tenth to five-tenths percent of deaths in American cities. He quotes an author who, studying 4,000 reported cases, found pain to be the first and chief complaint in 29 percent; it was felt either in the chest, one of the shoulders or in the back. In the other cases the pain developed later from pressure upon nerves.

"Aneurisms result from conditions weakening the arterial wall and increasing the blood-pressure. The Anglo-Saxon race is most frequently affected; the English more than the American, a condition attributed to the greater consumption of alcohol in England. . . . It is three times as prevalent in the American negro as in the white race. Aneurysm is most frequent between the ages of 30 and 50, a period when degenerative changes in the arteries are especially found in those engaged in laborious physical work." (McMillin was 46 years old at the time of his death.)

Men are affected about ten times as frequently as women. This is attributed to the more laborious occupations of men and their greater tendency to dissipation.

"Soldiers, sailors, athletes, cab drivers, furnace men, and others engaged in violent, but intermittent exercise are especially predisposed to aneurism. It is eleven times more frequent in the English army than in the civilian, and is much more frequent in soldiers than in sailors, a condition attributed to the pressure and strain from poorly fitting clothing and heavy accoutrements. . . .

"Those conditions that produce a weakening of the arterial wall, . . . are important predisposing causes to aneurism. These include syphilis, alcoholism, rheumatism, gout, and the action of mineral poisons like lead."

An author is quoted to the effect that arterial disease seems to be attributable to syphilis in about thirty-two percent and to tuberculosis in about sixteen percent of the cases. Another writer obtained a history of syphilis in seventy-seven percent of thirty-four cases of aortic aneurism at the Helsingfors Hospital since 1900. Other diseases are noted as factors. Some cases are congenital. The rupture of an aneurysm may be immediately fatal, or the patient

may live for days where there is repeated or continuous leakage. Recovery is rare after the rupture of an aneurysm of one of the large arteries. There may be repeated moderate hemorrhages. Aneurysms tend to dilate progressively and finally to rupture, but may remain substantially stationary for many years. There is much more about diagnosis and treatment.

In "Diseases of the Heart and Aorta" by Hirschfelder there is a more extended article (pp. 631 to 673). The author notes that 59 percent of the aneurysms occur between the ages of 30 to 50 and that those of the aorta 34 percent occur in the ascending aorta, 34.8 in the arch of the aorta, 17.4 percent in the descending aorta, and 13.8 percent in the abdominal aorta. Syphilis is noted as a cause of weakening of the arterial walls in a large percent of the cases (citing a number of medical writers on the subject) with a percentage of cases shown by the respective study varying from 25 percent to 92. It was particularly noticeable in the cases where the patients were under 30 years of age. In the factors noted are alcohol, hard work, lead poisoning, tobacco, gout, nephritis, and especially the infectious diseases; and it is said:

"The sudden rise of blood-pressure which occurs during lifting and heavy strains is a particularly important predisposing factor, and the patient often notices that his first symptoms occurred at the time of a heavy muscular strain or began just afterwards."

On page 637 it is said:

"A rupture is especially precipitated by high blood-pressure, such as occurs on exertion."

In the taking of the evidence quite a little was said about trauma. Doctor Brungard made it clear that trauma, such as might be received from one falling, would not penetrate to the aorta so as to produce an aneurysm. He was asked if an aneurysm could be benefited or cured by a surgical operation and stated that some of them are operated upon in the large hospitals, but no one in this part of the country would undertake it. Those interested in aneurysms caused by trauma and operations upon them can get much information by reading the following articles: By Penick in the October, 1943, number of "Surgical Clinics of North America"; by Wise in the December, 1943, issue of the same publication; by Greenwood in the December, 1944, issue of the "Texas State Journal of Medicine"; by Ball in the April, 1945, issue of the same publication; by Dandy in the January, 1946, issue of "Archives of Surgery"; by Lilly in the April, 1946, issue of "Annals of Surgery," and by Pratt

in the June, 1946, issue of the "American Journal of Surgery." (The medical works mentioned may be consulted or obtained from the medical department of our state library.)

We think the medical evidence fully sustained the finding of the trial court that the personal injuries sustained by McMillin in the course of his employment on February 5, 1946, aggravated his existing condition, which resulted in his death on February 28.

From the facts disclosed by the evidence all we know of the existence of the aneurysm was that disclosed by the X ray of February 25. Perhaps the same result would be reached if that X ray had never been taken. As disclosed by the evidence it may be summarized as follows: Here was a workman who had worked steadily for many years at hard labor, during which time he had enjoyed normally good health. In December, 1945, he developed a cough, with indefinite pains in his chest and abdomen. His idea was that he had something wrong with his heart. He consulted a reputable physician who, because of his cough and chest pains, treated him for a cold. That treatment was not helpful. An X ray was taken of his chest, which showed a normal condition for a man of his age; also an X ray was taken of his stomach, which showed a defect at the pylorus, indicating an ulcer. An appropriate treatment for that condition was followed and under this treatment the patient improved rapidly. In less than three weeks his cough and pains had ceased and he had made a substantial gain in weight. Though not fully recovered, he felt like going to work and did so under the doctor's permission. On the second day he worked he sustained personal injuries by accident, sufficiently severe that within thirty hours he was completely incapacitated, was forced to take to his bed, where he grew progressively worse until his death about three weeks later. These are things nonmedical witnesses could testify to, and did.

The only legal question submitted to the court in this case was whether there was substantial, competent evidence to sustain the judgment of the trial court in making the award for compensation. That question must be answered in the affirmative.

The judgment of the court below is affirmed.

THIELE, J. (dissenting): In my opinion the judgment of the trial court is not sustained by substantial competent evidence, as is required under the law of this state. (See, e. g., *Fair v. Golden Rule Refining Co.*, 134 Kan. 623, syl. ¶ 2, 7 P. 2d 70.)

In approaching the question whether there is substantial evidence to support the award and judgment of the trial court, it is well to bear in mind certain fundamental principles of law. In *Brenn v. City of St. John*, 149 Kan. 416, 422, 87 P. 2d 546, it was said that in a workman's compensation case the burden is on the claimant, and he must prove the various elements that together show his right to an award. To the same effect see *Phillips v. Okey*, 111 Kan. 732, 207 Pac. 1106. See, also, *Gamble v. Board of Public Utilities of Kansas City*, 137 Kan. 227, 19 P. 2d 729, and *Rush v. Empire Oil & Refining Co.*, 140 Kan. 198, 34 P. 2d 542. In *Whitaker v. Panhandle Eastern P. L. Co.*, 142 Kan. 314, 46 P. 2d 862, it was claimed by the workman that his diabetic condition was caused or accelerated by injury received by him during the course of his employment. Without reviewing the evidence it may be said his doctor testified that under the facts, the workman's condition might possibly be the result of injury. This court said, in part:

"Claimant relies on the fact that, as he testified, he was in good condition before the accident and began to be sick soon after it. It will be seen that the only medical testimony that was furnished by claimant was that it was *possible that an aaccident such as that described by claimant might have caused his condition*." (l. c. 317.) (Emphasis supplied.)

The court's opinion concluded:

"Taking all the evidence in this case in its most favorable light for claimant and giving claimant the benefit of all inferences to be drawn from the proven and admitted facts, the conclusion to be drawn rises but little higher than a surmise or conjecture." (l. c. 318.)

See, also, *Hall v. Armour & Co.*, 153 Kan. 656, 659, 113 P. 2d 145; *Carney v. Hellar*, 155 Kan. 674, 678, 127 P. 2d 496; *McMillan v. Kansas Power & Light Co.*, 157 Kan. 385, 139 P. 2d 854; *Hall v. Kornfeld-Harper Well Servicing Co.*, 159 Kan. 70, 73, 151 P. 2d 688; and *Copenhaver v. Sykes*, 160 Kan. 238, 242, 160 P. 2d 235; where the rule above stated is recognized as sound.

In this case the essential question is not whether the workman's death might *possibly* be the result of injuries sustained by him in the course of his employment, but whether it *probably* resulted from those injuries.

In my view of the matter it is not necessary to review the evidence for the trial court's judgment discloses that it reached its award and judgment through conjecture and surmise, and from a misconception of the law applicable to the case.

The trial court found that the medical testimony was supplied by three physicians, each of whom disqualified himself as an expert in the particular field of inquiry. After making reference to X-ray plates the court stated an aneurysm was defined as being a gradual deterioration of the walls of blood vessels, so that a weak spot develops; that the rupture of an aorta *could* be caused by a strain; that development of an aneurysm is ordinarily slow, but if a man had one it would be aggravated by severe or extreme exertion or strain or even a mental strain, very suddenly; that after the workman's death it was apparent that he must have had a beginning aneurysm on February 5, 1946 (date of claimed accident), and that an exertion *could* have aggravated his condition so that it *might* culminate in death. It may here be noted the testimony showed that a scare, a bad cold or a cough, using the stool, stepping off a curb or any strain, mental or physical, might aggravate the condition. It may also be noted that no one testified that the workman's death was the probable result of any aggravation of his condition caused by the alleged accident. The court, in its award, stated further:

"Under the liberal rules which have heretofore been announced as to the evidence necessary to establish the occurrence of such an accident, it is held by the court that there is sufficient showing in this case to establish the fact that McMillin sustained such an accident [and as to the foregoing, I am not particularly in disagreement] and that the accident on February 5th aggravated his condition so that it was the cause of the death even though the death did not occur until February 28th, 1946. The decedent's employment was under the Workman's Compensation Act and the injury is shown to have arisen out of and during the course of the employment. *No other reasonable alternative is offered to account for the rapid development of the aneurysm, except that it was caused by decedent's exertion on the morning of February 5th.*" (Emphasis supplied.)

Two things are evident from the above: That the trial court was not able to find any evidence that the decedent's death was the probable result of any injury sustained by him, and that it placed the burden of proof upon the employer to show that the decedent's death was the result of something other than his accidental injuries. Neither meets the requirements of law. The result is that the award rests only upon conjecture and surmise and should not be allowed to stand.

I am authorized to say that Mr. Justice WEDELL and Mr. Justice BURCH concur in the above views.