No. 30,395.

J. A. FAIR, *Appellee*, v. THE GOLDEN RULE REFINING COMPANY and TRAVELERS INSURANCE COMPANY, *Appellants*.

(7 P. 2d 70.)

Opinion filed January 30, 1932.

*C. H. Brooks, Willard Brooks, Howard T. Fleeson* and *H. T. Horrell,* all of Wichita, for the appellants.

*E. P. Villepigue, W. A. Ayres, A. M. Cowan, C. A. McCorkle, J. D. Fair* and *W. A. Kahrs,* all of Wichita, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This is a workmen's compensation case. The compensation commissioner heard the evidence, made findings and denied compensation, stating:

"The evidence herein does not sustain a finding that the alleged injury . . . resulted in the disability complained of by claimant, the disability being partial paralysis."

The claimant appealed to the district court. The court found for claimant, stating, among other things:

"I might add that I have had considerable difficulty in reaching a decision in this case for the reason that the apparent preponderance of evidence was against Mr. Fair, but while most witnesses could testify as to his general appearance and the way he did his work, he is the only one who could testify as to his real condition and it is for this reason that I decide the case in his favor."

The employer and insurance carrier have appealed. The principal question argued here is whether there is sufficient evidence to sustain the judgment of the trial court.

Preliminary to that is discussed the scope of the authority of this court to review a workmen's compensation case on appeal. The statute (R. S. 1931 Supp. 44-556) provides that any party to the proceedings may appeal from any findings or order of the district court to the supreme court "on questions of law." Broadly speaking, this is the scope of the authority of the supreme court to review all classes of appealed cases. It was said in *Major v. Major,* 2 Kan. 337: "The supreme court takes cognizance only of errors of law apparent on the record." And substantially the same thing has been said in numerous cases. Under our scheme of jurisprudence the trial courts are the fact-finding tribunals; the supreme court, on appeal, reviews questions of law. This court does not weigh conflicting evidence, nor does it disturb, for any reasons pertaining to evidence, a finding or judgment of a trial court supported by competent, substantial evidence, even though the quantity of such evidence is not great. But a finding or judgment of a trial court should not, and cannot, stand unless it has some competent, substantial evidence to sustain it. This has been the ruling of this court on many occasions, though varied phraseology has been used in stating the ruling. This principle has been applied not only to criminal actions (*State v. Moskowitz,* 115 Kan. 485, 223 Pac. 279), but to the varied kinds of civil actions and special proceedings (*Ogg v. Ogg,* 124 Kan. 443, 260 Pac. 647; *Maddy v. Hock,* 134 Kan. 15, 4 P. 2d 408), including workmen's compensation cases. (*Shay v. Hill,* 133 Kan. 157, 299 Pac. 263.)

Whether a finding or judgment of a trial court is sustained by sufficient evidence—that is, substantial, competent evidence—is a question of law, as distinct from a question of fact. When this question is presented to this court it will examine the evidence solely for the purpose of determining that question. (*Paul v. Skelly Oil Co.,* post, p. 636.) If sufficient evidence is found in the record to support the judgment of the trial court the judgment will be affirmed, so far as it relates to that point (*Harrigan v. Western Coal & Min. Co.,* 133 Kan. 573, 300 Pac. 1115), but if such evidence is not found the judgment will be reversed. The question whether an injury or disability is the result of an accident, within the meaning of the statute, may be a question of law where the facts are not contro-

verted.  (*Corpora v. Kansas City Public Service Co.*, 129 Kan. 690, 693, 284 Pac. 818.)

The facts, which are not seriously in dispute, may be stated as follows:  The claimant, whom we shall hereafter refer to as plaintiff, at the time of the alleged accidental injury which forms the basis of his claim for compensation, was about sixty-five years of age.  About eight years prior thereto he had diabetes, accompanied by high blood pressure.  He was treated for this two weeks or more in the hospital and was off from work for six weeks.  The disease yielded to the treatment, the blood pressure went down, and thereafter he was able to work at his vocation until the latter part of January, 1930.  Throughout that time, however, he adhered to a diet prescribed by his physician, whom he consulted about once a month, up to August, 1929.  For about eleven years prior to his alleged accidental injury he was employed by the defendant refining company as an auditor.  The refining company had a number of retail oil stations located in various parts of the city of Wichita.  It was plaintiff's duty to visit each of these stations every day, check up and audit the business of the station, and report to the head office of the refining company.  In transacting this business he used his own Ford sedan.  When the cold weather came on in January, 1930, the car got so it was hard to start.  Frequently he would have to crank it by hand.  Sometimes his son would start the car by pushing it with another car.  His wife observed that he did not appear to be feeling so well after his car began to give him trouble, and an employee at one of the stations observed that he had not been looking well for some time before he quit work.  On January 15, 1930, he stopped at one of defendant's filling stations on his regular route, got out of the car, transacted his business at the station, talked with the attendant for a few minutes, then got in his car and stepped on the starter.  It did not start and he got out and cranked it, but did not get it to start.  Mr. Hay, the station attendant, cranked it for him.  He stood near one of the pumps while that was being done, then got in the car and sat there a little bit, and said:  "Well, I had better start on, I am late."  He was a little later than usual.  He said:  "I will go on.  Thank you, Luther, for cranking the car."  Mr. Hay testified that he further said "he guessed he was not as young as he was," and that "he just set there like it wore him out to crank it, like it tired him.  At the time I glanced up at him and he looked a little pale, kind of yellow."  When he called at that sta-

tion during the next week the attendant noticed that "he didn't move around like he had been, he'd set down . . . like he was resting, noticed he looked kinda yellow-complexioned, . . . just acted like he didn't feel . . . very good." Previously he would sit and talk for ten or fifteen minutes, but after that "he took his report and went on like he was in a hurry to get around."

Mr. Hay noticed no confusion in his speech, and nothing indicated paralysis in any of his limbs, although he was a little slow in his movements. With reference to that occurrence plaintiff testified when he got through trying to crank his car he felt dizzy, that it affected his hearing and his eyesight, that his eyes felt like they were looking at two things at once. He went ahead with his work after leaving the station referred to, went to the other stations, transacted his business, and made his report. He continued that work each day until January 22. He testified to no trouble in performing his duties during that time, and the three officers of the defendant refining company with whom he transacted business each day noticed no difference in his condition, or in the manner in which he transacted business, and he made no complaint to any of them with respect to his condition. When he went home from his work on the evening of January 21 his wife noticed that he did not appear well. He ate his supper as usual, but seemed to feel worse, and she got him to bed. The next morning he got up and fixed the furnace, as was his custom, but he went about the work as though he did not fully realize what he was doing. He seemed to be in a dazed condition. He could not talk, but just mumbled. His wife called one of the boys. A physician was called, who found him suffering from high blood pressure, about 240, a slight weakness of the right arm, an impaired grip, sensory changes and mental confusion, and his speech was thick and slow and stuttering. The diagnosis was of cerebral hemorrhage. He was taken to the hospital and treated. He improved enough to enable him to return home, but is wholly incapacitated from performing his duties as an employee of defendant.

Plaintiff testified that from the time of the occurrence at the filling station, above mentioned, on January 15, to the evening of January 21, he continued to perform his work as usual. During that time his car continued to give him trouble about starting. He cranked it on numerous occasions, and sometimes some one else cranked it for him, but there is no evidence that his cranking the car, or his efforts to do so during that time, had any bad effect upon him. Sometime

in April he first thought that he had a claim for compensation, and on April 12, through his son, who is an attorney, he presented a claim to the defendant refining company for compensation. This is the first knowledge the refining company had of the matter.

Turning now to the medical evidence. Five physicians testified. All of them agree that when the physician was called and examined him on January 22 plaintiff was suffering from what is commonly called a stroke of apoplexy, or paralysis, the immediate cause of which was a lesion or break of a blood vessel in the cranium. Plaintiff's case depends on connecting this condition with what occurred at the filling station on January 15. The physicians all testified that a lesion of the blood vessel in the cranium would manifest itself by paralysis at once, or within a few hours at the longest. Some of them testified it would not be possible for a lesion of the blood vessel in the cranium to have occurred on January 15 and not manifest itself by paralysis until the morning of the 22d. Others thought it would be highly improbable and entirely speculative to take that view. The testimony was that the effect of overexertion by one cranking a car ordinarily would be to increase the heart action, which would subside when the exertion ceased, and the effects of which would pass away in a few minutes, or in an hour or two at the most. If the effect of the exertion increased the heart action the face would be flushed, while the evidence by the station attendant here was that the plaintiff was pale, or yellow, which according to the medical evidence would indicate, not excessive heart action, but rather a weak heart, unable to respond normally to the increased exertion. One of the physicians thought there might have been at the time of the occurrence on January 15 a very small lesion of one of the blood vessels in the cranium, not enough of a lesion to cause paralysis at the time, but which would increase slowly and "would produce in him instability, uneasiness, not enough to lay him out, he couldn't see clearly, was uncertain of himself, forgetting easily, and later build up until the whole thing breaks over," and it is possible that such a rupture could have occurred and he at the same time be pale from a weak heart. Another one of the physicians testified:

"Q. Doctor, would you say it would be possible to crank a Ford and cause a small rupture of a vein in the brain and go ahead and work for a week before he would suffer from a stroke of this kind? A. I would say it is possible for the cranking of a car, the extreme exertion, to cause a gradual increase in blood pressure which would come to the point and cause a rupture in a short time; I wouldn't say the rupture was caused at the time.

"Q. Knowing his condition at this time, and knowing what happened, would that in your opinion cause his condition at the present time? A. It is the aggravating cause.

."Q. The aggravating? A. The cause of the condition, with nephritis and increased blood pressure, that extreme exertion could aggravate it to such a point that he would have a hemorrhage.

"Q. Would you say that is what occurred in this case? A. That is, in my opinion, that is what happened. . . . The lesion or hemorrhage of an artery in the brain manifests itself by paralysis of the nerve involved. There is confusion in the mind if the hemorrhage is near the speech center.

"Q. If there is a lesion or hemorrhage of an artery of the brain, how soon would it manifest itself? A. That depends on the size of it, usually pretty quick, although it may be a progressive thing.

"Q. How quick? A. It may be an instant and may be longer.

"Q. Will it manifest itself within twenty-four hours? A. You will get some manifestation, yes, but it may be a progressive affair, keep oozing, if the hemorrhage keeps oozing, you will get a progressive affair."

Plaintiff relies on this testimony to show a causal connection between what occurred January 15 and the paralysis on the 22d. But it is clear it does not do so in this case. Obviously these theories are highly speculative and problematical, but since we are not passing on the weight of evidence, we shall regard them as correct. The difficulty here is the facts do not accord with these theories. There is no evidence of gradual impairment of plaintiff's condition from January 15 to the 22d, "a progressive affair," producing instability, uneasiness, impaired vision, uncertainty of self, forgetfulness, until the whole thing broke over. The evidence is directly to the contrary. Plaintiff went about his work as usual, cranked his car repeatedly, transacted business for and with his employers with no such disabilities apparent or observable, and making no complaint to anyone of any disability, inconvenience or discomfort. Hence these theories, however sound they may be in the abstract, are insufficient to sustain a finding and judgment that the paralysis of January 22 was produced or caused by the incident of the 15th.

We are not unmindful of the fact that the workmen's compensation act is to be construed liberally to promote its purposes, nor do we intend anything said here to weaken the force of that rule. But this does not mean that every claim made under the act must be paid; to so hold would not promote the purposes of the act, but would tend to destroy it. The act does not contemplate that compensation shall be paid for disability resulting from disease (*Cox v. Refining Co.*, 108 Kan. 320, 195 Pac. 863)—even industrial disease

(*Chop v. Swift & Co.*, 118 Kan. 35, 233 Pac. 800)—unless the same results from accidental injury, as that term is used in the act. What we mean to hold is that before a claim for compensation can be sustained there must be substantial, competent evidence to support it. Claims cannot be sustained which rest purely on conjecture, or upon abstract theories not applicable to the facts.

There is another reason why this case must be reversed. The trial court, in effect, found preponderance of the evidence to be against plaintiff, and yet rendered judgment in his favor. This was clearly erroneous. The decision should have been in accordance with the preponderance of the evidence. No other rule could be invoked with safety. Neither is it safe to disregard other evidence, and rely upon that of the claimant.

The judgment of the court below will be reversed with directions to enter judgment for defendants.