No. 41,558

Elmer H. Wilson, Claimant, *Appellee*, v. The Santa Fe Trail Transportation Company, Self-insurer, Respondent, *Appellant*.

(347 P. 2d 235)

Opinion filed December 12, 1959.

*J. B. Reeves,* of Topeka, argued the cause, and *C. J. Putt, W. E. Treadway* and *Edwin M. Wheeler,* also of Topeka, were with him on the brief for appellant.

*Wade A. Myers,* of Emporia, argued the cause, and *Champ Graham,* also of Emporia, was with him on the brief for appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is a workmen's compensation case. By written claim served on the respondent-employer on the 21st day of November, 1957, the claimant alleged that he suffered a coronary thrombosis on the 11th day of February, 1957, while in the employ of the respondent. After hearing the case, the commissioner on the 18th day of July, 1958, entered an award in favor of the claimant and against the respondent, a self-insurer, for twenty-five weeks of temporary total disability, followed by 60% permanent partial general disability not to exceed the remaining three hundred ninety weeks, all payable at the rate of $32 per week, subject to review and modification as provided by law.

On appeal to the district court judgment was entered for the claimant as follows: The court "is of the opinion that there was sufficient evidence introduced in the hearing before the Commissioner to support his findings." From the foregoing order the respondent has duly perfected an appeal to this court.

The questions presented for review are stated by the appellant in its brief as follows:

"I. Was written claim for compensation filed by claimant with his employer within the time specified by the Kansas Workmen's Compensation Act?

"II. Is the order in this case supported by substantial, competent evidence proving that claimant met with an accident arising out of and in the course of his employment?

"III. Did the District Court properly fulfill its function by looking at the record solely to see if there was sufficient evidence introduced in the hearing before the Commissioner to support his findings?"

The third question may be summarily answered. The trial court in October, 1958, had before it the oral arguments of counsel, briefs and transcripts. It took the matter under advisement and finally in March, 1959, five months later, rendered its judgment. It could hardly be suggested the trial court made a quick decision. The point presented was before this court in *Davis v. Haren & Laughlin Construction Co.*, 184 Kan. 820, 339 P. 2d 41. The rule was acknowledged that on appeal in a workmen's compensation proceeding, the district court must try the case *de novo* on the record and make its own findings. In the *Davis* case the judgment of the trial court was worded in language similar to that above, and it was said the court's statement in its letter of judgment to counsel must be treated in effect as a statement that after independent determination it "adopted" the commissioner's findings and award. Thus viewed, it cannot be said here the court erred in entering judgment for the claimant on this point.

The facts, supported by the evidence, are that on February 11, 1957, the claimant, Elmer H. Wilson, while unloading furniture, felt a sharp pain go through his chest. At the time he experienced the sharp pain he was lifting a refrigerator. He was working for the respondent, The Santa Fe Trail Transportation Company, at the time of the attack as a pick-up truck operator. He continued with his work a few minutes there and then told Mr. Morfitt, a fellow employee who was also a pick-up truck operator for the respondent, he did not feel well and that he was going into town. He then went to Sears and Roebuck to pick up some freight, suffering with pain, and lifted sacks weighing approximately 75 to 125 pounds, and the pain became worse. Thereupon he sat in his truck for approximately an hour with no relief. He next went to Haynes Feed Store across the alley from Sears and Roebuck and telephoned his wife to bring him some anacin in an effort to get relief. While in the feed store he talked to Mr. John Fuller, a feed salesman, and told him he did not feel well and that he had severe pains. Mr. Fuller, when asked the purpose of the claimant's call on the 11th day of February, 1957, testified:

"Well, he just come in there and said he was sicker than hell, and said he wanted to call his wife; that's just about the way he worded it."

He further testified the claimant used the telephone and he later saw the claimant with Mrs. Wilson, his wife, in the alley.

The claimant testified his wife came with some anacin. She asked him to leave his truck and go to the doctor but he told her he would "try to suffer it out." The claimant then made another call and returned to the respondent's dock about 4:00 p. m., where he spoke with Mr. Scheck and told him he had a "hurting in my shoulders." He sat around on the dock and did a little work there. At 5:30 that evening his father-in-law came to take him home.

His wife then called Dr. Charles R. Hopper who wanted to come by and give the claimant a shot, but the claimant declined thinking that he might get relief during the night. The claimant then propped himself up on the divan without taking off his clothes where he remained all night. He testified that he did not get any sleep that night and the pain was gradually getting worse. A little after 12:00 noon on the following day his wife took him to Dr. Hopper's office. After examination the doctor informed him he had suffered a heart attack twelve to twenty-four hours previous. The claimant was thereupon hospitalized under oxygen. He was released from the hospital on the 14th day of March and sent home by ambulance for bed rest for three weeks, during which time Dr. Hopper continued to visit him. Later he entered the Veterans Hospital in Topeka about May 16th and was there for nine days.

When the claimant returned to Emporia he continued to make visits to the hospital to see Dr. Hopper, his private physician. In the month of June, 1957, he saw Dr. Funston J. Eckdall, the respondent's contract doctor in Emporia, at the hospital in an attempt to get a release to return to work. Dr. Eckdall informed the claimant if he wanted to see his family raised he could not go back to work.

Dr. Hopper testified he consulted with Dr. Eckdall and when asked why he happened to consult with Dr. Eckdall he answered:

"A. I think he came to me and asked me if he could have some of my original electrocardiograph tracings, and what the original findings were, and what I thought of his physical condition.

"Q. And do you know why he was interested in this information?

"A. Well, I think he was going to have to examine him, as I understand it, and pass on him whether he was able to return to work or not.

"Q. For the company; is that correct?

"A. For the company.

"Q. You state you continued to have Mr. Wilson under your treatment?

"A. Yes."

Dr. Eckdall testified he saw the claimant at the hospital in June, 1957, and his reason for being asked to consult with Dr. Hopper was that he represented the respondent and was supposed to recommend whether the claimant could return to work. His conclusion at that time was that the claimant definitely had a coronary accident and he did not recommend that the claimant return to work. Dr. Eckdall said he gave the claimant an examination on the 10th day of August, 1957, when the claimant came to his office wanting to return to work:

". . . which was a perfectly natural feeling, and I stated that he had been out—this is a little conflicting, but he had been out the day before pitching hay, which would be a rather strenuous task to anybody who had any sort of a coronary injury; and on 8/10/57, he had an inversion of his 'T' waves in Lead 1, which is usually considered as good evidence of a coronary accident, and it has never become upright since that date. I believe that I was lulled, you might say, or kidded, in a sense, to give him release; I talked it over with Hopper, and he more or less agreed on the date of August the 12th; . . ."

As a result of claimant's efforts Dr. Hopper gave him a release on the 10th day of August, 1957, to return to work stating that as a result of examination on August 3, 1957, "all findings were negative for disabling heart disease. Released to return to work." On the 12th day of August, 1957, Dr. Eckdall gave the claimant a release noting on the form that claimant "Had coronary Feb. 1957 Ecg and heart examination normal now." Dr. Eckdall's certificate on the medical examination form of The Santa Fe Trail Transportation Company releasing the claimant reads.

"This is to certify that I have this day examined Elmer H. Wilson in accordance with S191.2, and the physical examination procedure prescribed by the Motor Carrier Safety Regulations, Revision of 1952 of the Interstate Commerce Commission, and that I find him . . . Qualified under said rules. I have kept on file in my office a completed examination form for this person.

| 8-12-57 | Emporia, Ks. | F. J. Eckdall M. D. |
|---------|--------------|---------------------|
| Date | (Place) | (Signature of Examining Doctor) |

Address of Doctor Emporia, Ks."

Following the certificate on the reverse side of the form is a note reading:

"I have seen previous electrocardiograms ran on this man at the time of his coronary. Ecg at this time is normal.

F. J. Eckdall M. D."

It is noted August 12th is the 181st day after February 11, 1957, the date of the accident. (See G. S. 1957 Supp., 44-520a.)

As a result of these releases the claimant returned to work for the

respondent on the 12th day of August, 1957, and after performing three hours of duty was sent home by Agent Haywood until he had been given a more complete physical examination.

Dr. Eckdall testified that he saw the claimant on August 12th because there was some dispute regarding the return of the claimant to work. Claimant said it was Mr. Haywood, agent for the respondent, who sent him to Dr. Eckdall on the 12th day of August.

Prior to giving the claimant a release Dr. Eckdall testified that he "talked with the office down there, and Hopper and I had both agreed that he was unfit for his old occupation, or present occupation, that he could be employed in something of a lesser capacity." He further testified:

"Q. Doctor, if you had been informed that his regular employment necessitated him lifting heavy cargo and doing heavy manual labor, would you have given him a release to do that type of work?

"A. No. You see, at times it all depends on the qualifications, sometimes, of an individual; if a man has proper qualifications and education, sometimes they can be transferred to jobs of lesser physical effort, and it has been done at times."

Dr. Eckdall's testimony at the hearing before the commissioner was confined to objective considerations and he concluded it was inadvisable for the claimant to return to any form of manual labor. Admitting that he had last seen the claimant on August 12th, he testified:

"Q.—but at the time you last saw him, would you say you felt Mr. Wilson's condition was one which would probably remain a permanent one?

"A. From looking at Dr. Hopper's EKG's, I would say that he would probably never return to normal EKG. I have seen all of Dr. Hopper's EKG's."

Dr. Hopper's testimony at the hearing before the commissioner was both subjective and objective. It is apparent Dr. Hopper was fully aware of the accident and the history as heretofore related, having been so advised by the claimant and his wife. As a result of the examination on February 12, 1957, in his office Dr. Hopper testified:

". . . it was my impression he suffered a heart attack, a coronary occlusion. I had an electrocardiogram tracing made at my office, and it showed evidence of acute myocardial infarction, or coronary occlusion, and he was referred to Newman Hospital.

"Q. This myocardial infarction you speak of, was it your opinion at that time or is it now that as of that time it was a recent infarction?

"A. Yes, this was an acute thing, probably of a 24-or-48-hour duration . . ."

In an attempt by counsel to establish a causal connection as to whether claimant's accident arose out of his employment, Dr. Hopper testified:

"Q. Did he say what he was doing at the time he had the pain? Did he say that to you?

"A. I think he was unloading furniture or carrying furniture. However, I didn't make any record of that because that would be something that I don't know about. He simply stated that while at work he had this pain and then it went away again after he stopped working for awhile. In other words, *in the history I was struck by the fact that the pain was pain on effort.*" (Emphasis added.)

The last examination of the claimant made by Dr. Hopper was on January 16, 1958, and he gives the results of that examination and his conclusions as follows:

"Q. Would you tell the Commissioner the results of that examination?

"A. Mr. Wilson has at this time made, I would say, a fairly good recovery from the initial heart attack that he suffered. He has a regular pulse, he has what we would call a normal blood pressure and also a normal heart rate. He has a very slight heart murmur, which is an abnormal sound heard over the heart. The electrocardiograph still shows some abnormality which goes along with a decreased blood supply through the coronary blood vessels or else scarring from old damage. You can't tell the difference from looking at it unless you go through all of them, and I do have a lot of them over a year's time. He also was having some hemoptysis, coughing up bright red blood; and I took an X ray of him at that time, also, and the X ray showed nothing at all except possibly a question of some increased pulmonary congestion, as if there might be some dilatation of the blood vessels. He was advised to stop smoking. He was doing some smoking at that time. This hemoptysis, or spitting up of blood, I found no cause for other than the fact that he might have some bronchitis from either possible upper respiratory infection—it was possibly aggravated by smoking. He didn't have any fever at that time. Otherwise I don't have any definite way of knowing where this came from. The X ray was clear.

"Q. As a result of the examination did you form or have you formed some conclusions as to what restrictions should be put on Mr. Wilson's activities?

"A. The restrictions on Mr. Wilson's activities are—he falls into a cardiac category recognized by the American Heart Association of a person who has had a coronary occlusion, or myocardial infarction. They have not shown complete recovery, by the fact that the electrocardiograph still is abnormal, they continue to have some kind of angina pain on effort. However, he does not have a severe tachycardia on mild exertion; and I would never want to be the one who decided to test him to the utmost to find out how far he could go. Mild exertion is all I have ever told him he could do, and I have forbidden him to run up and down steps or carry heavy weights. I have told him he must take care of himself and get regular rest, and light work is all that he could ever expect to do again.

"Q. Would you say Mr. Wilson could do the work he was doing at the time of his accident?

"A. No."

Upon the record presented it is apparent the written releases given the claimant by Dr. Hopper and Dr. Eckdall authorizing the claimant's return to work were absolute and without reservation or qualification. Further development of the facts, as the opinion progresses, will illustrate the economic havoc these releases forced upon the respondent because they did not fully disclose the claimant's true physical condition and his limited capacity for work.

The respondent is engaged in interstate commerce and the claimant's employment with the respondent required him to drive a vehicle, a pick-up truck, in interstate commerce. Under the safety requirements of the Interstate Commerce Commission every driver in interstate commerce must be examined periodically. If such driver is off for illness, he must be recertified as safe to drive.

After the claimant was discharged on the 12th day of August, 1957, "until further examination," the respondent through Agent Haywood referred the claimant to Dr. Eckdall, but did nothing further to reinstate the claimant or inform him of his status for more than two months. He was referred to Dr. Emery R. Calovich, a heart specialist for the respondent in Kansas City, Missouri, for examination on the 23rd day of October, 1957. The sole purpose of this examination was to determine the physical fitness of the claimant to drive a truck in interstate commerce.

After Dr. Calovich interviewed the claimant and examined him physically, he gave his impression as follows:

". . . I thought this man had hypertension, that he had obesity, and that this hypertension was connected somewhat with his heart and should be termed hypertensive cardiovascular disease. I also concluded that, I believed this man had a myocardial infarction that was probably old and healed. That was the real basic conclusions . . .

.    .    .    .    .    .    .    .    .    .    .    .    .

". . . it was my conclusion that this man was a hazard to himself and to his employer, as well as to the public in general; that he be not permitted to operate a commercial carrier; and that he be not permitted to lift cargo and participate in any strenuous activity because of all the above that I have given you."

Dr. Calovich again examined the claimant on the 23rd day of January, 1958, when he stated the purpose of his examination was to determine whether or not the injury to the claimant's heart was directly associated or connected with his occupation and to de-

termine whether there was disability resulting from his heart injury or myocardial infarction, and if there was disability, to what extent such a disability existed. His conclusions as a result of that examination were:

". . . this man had hypertensive cardiovascular disease; that he had an old, healed anteroseptal, midclavicular infarction; that he was obese; it is also my impression that there could be an element of cor pulmonale, which refers to strain on the lungs, which I had noted previously in the tracings. These were the conclusions, as far as the disease processes involved with this man on the second visit."

His conclusions as to whether or not claimant was suffering from any permanent disability were:

". . . this man was suffering no sequalae as a result of his myocardial infarction. I also concluded that I thought he had a partial, permanent disability as a result of his myocardial infarction. I also, concluded, after much thought, that this disability should be placed at a figure, and that figure was placed at 20 per cent."

The extent of the claimant's disability is not an issue on this appeal and no further reference will be made to it.

The deposition testimony of Dr. Calovich was rather long and extended. The respondent sought to establish that claimant's accident possibly occurred prior to the date the claimant said it did. As to whether claimant's accident arose out of his employment he testified:

"Q. Doctor, was there anything in the history of this man that would permit you to determine whether or not his work would become an etiological factor in this myocardial infarction?

"A. It was my impression that Mr. Wilson's occupation was not too etiological a factor in producing the myocardial infarction."

The opinion of Dr. Calovich on this point is: That it is possible, not probable, that claimant's accident arose out of his employment.

On the basis of the foregoing evidence standing alone, assuming the claim for workmen's compensation was filed in time under the applicable sections of the workmen's compensation act, the application of familiar rules of law to the facts warrant approval of the findings of the commissioner, adopted by the trial court, that claimant met with an accidental injury on February 11, 1957, when he had a coronary occlusion, which arose out of and in the course of his employment.

On appellate review of workmen's compensation cases our inquiry is limited to questions of law only. (G. S. 1957 Supp., 44-556.) This means the court's duty is to determine whether the

findings of the district court are supported by substantial, competent evidence. If, when considered in the light most favorable to the prevailing party below, the record contains any evidence to support the district court's judgment, that judgment must be affirmed even though the record discloses evidence which might warrant the district court making a finding to the contrary. (*Davis v. Haren & Laughlin Construction Co.*, 184 Kan. 820, 339 P. 2d 41; *Heer v. Hankamer Excavating Co.*, 184 Kan. 186, 334 P. 2d 372; and cases cited in these authorities.)

The court does not review the record to ascertain whether it contains evidence to support a contrary finding, but only whether there is substantial, competent testimony to support findings made by the district court. (*Angleton v. Foster Wheeler Construction Co.*, 177 Kan. 134, 276 P. 2d 325; and cases cited therein.)

It has been held that coronary occlusion, coronary thrombosis, cerebral hemorrhage, or heart failure-acute, which resulted in death or disability to a workman, was personal injury by accident when it arose out of and was received in the course of employment. (*Alpers v. George-Nielsen Motor Co.*, 182 Kan. 790, 324 P. 2d 177; and cases cited therein.) Other heart cases to which reference is made are *Pinkston v. Rice Motor Co.*, 180 Kan. 295, 303 P. 2d 197; *Hill v. Etchen Motor Co.*, 143 Kan. 655, 56 P. 2d 103; and *Peterson v. Safeway Stores*, 158 Kan. 271, 146 P. 2d 657.

In *Kafka v. Edwards*, 182 Kan. 568, 322 P. 2d 785, a heart case, the trial court found the injury did not arise out of and in the course of employment, and this court affirmed. A similar finding was affirmed in *Grow v. Musgrove Petroleum Corp.*, 184 Kan. 800, 339 P. 2d 75.

The workmen's compensation act prescribes no standard of health for a workman, and if his physical structure gives way under the stress of his usual labor his death or injury is an accident which arises out of his employment. The general rule appears to be that the injury arises out of the employment when there is apparent to the rational mind, upon consideration of all the circumstances, a causal connection between the conditions under which the work is required to be performed, and the resulting injury. (*Carney v. Hellar*, 155 Kan. 674, 127 P. 2d 496; *Pinkston v. Rice Motor Co.*, supra; and *Alpers v. George-Nielsen Motor Co.*, supra.)

The elements of the term "accident" as well as other provisions of the Kansas workmen's compensation act, must not be construed in a strict and technical sense but liberally in a manner designed

to effectuate the true intent and purpose of the act. (*Kauffman v. Co-operative Refinery Assn.,* 170 Kan. 325, 225 P. 2d 129.)

Was written claim for compensation filed by claimant with his employer within the time specified by the Kansas workmen's compensation act?

The commissioner found that notice was received of the accidental injury by the employer, and since no accident report was filed by the employer within seven days following February 11, 1957, the statutory limitation for the filing of a claim within one hundred eighty days was lengthened to one year.

It is conceded that no accident report was filed by the respondent with the workmen's compensation commissioner until after the claimant filed his claim for workmen's compensation on the 21st day of November, 1957. The respondent contends it did not know the claimant suffered an accident arising out of and in the course of his employment. The claimant left his work at the usual time of 5:30 p. m., on February 11, 1957.

G. S. 1957 Supp., 44-557, provides in part:

"It is hereby made the duty of every employer . . . to make or cause to be made a report to the commissioner *of any accident, or claimed or alleged accident,* to any employee which occurs in the course of his employment and of which the employer or his foreman has knowledge, within seven (7) days, after the receipt of such knowledge: . . . *Provided further,* That no limitation of time in this act provided shall begin to run unless a report of the accident as hereinbefore provided has been filed at the office of the Kansas workmen's compensation commissioner *if the injured workman shall have given his notice of injury as provided by section 44-520* of the General Statutes of 1949: *Provided, however,* That any proceeding for compensation for any such injury or death, where report of accident has not been filed, must be commenced before the commissioner within one year from the date of the accident, suspension of payment of compensation, or death of such employee referred to in section 5[*] hereof." (Emphasis added.)

G. S. 1949, 44-520, reads:

"Proceedings for compensation under this act shall not be maintainable unless notice of the accident, stating the time and place and particulars thereof, and the name and address of the person injured, shall have been given to the employer within ten (10) days after the accident: *Provided, That actual knowledge of the accident by the employer or his duly authorized agent shall render the giving of such notice unnecessary: Provided further,* That want of notice or any defect therein shall not be a bar unless the employer prove that he has been prejudiced thereby." (Emphasis added.)

It is definitely stated in 44-557, *supra,* that if the employer or his foreman has knowledge of an accident occurring to any employee

in the course of his employment, notice must be given as provided in the statute. The emphasized clause quoted in 44-520, *supra,* excuses an injured workman from giving notice where the employer has actual knowledge of the accident. We interpret the last clause of the first proviso, emphasized in 44-557, as one requiring the employee to give notice of injury in compliance with the provisions of 44-520, unless he is excused from the giving of such notice as provided therein. In other words, if the employer has actual knowledge of the accident, the injured workman is excused from giving the notice required, and failure of the employer to file a report of accident with the commissioner of an accident to an employee, which occurs in the course of his employment, extends the limitation of time within which to commence a proceeding under the workmen's compensation act to one year as set forth in the second proviso of 44-557.

A resort to the record discloses that Mrs. Wilson, the claimant's wife, after Dr. Hopper had diagnosed the claimant's accident as a coronary occlusion, somewhere around 4:00 or 4:30 in the afternoon of February 12, 1957, went in person to notify Mr. Haywood, the respondent's agent, that her husband had suffered a heart attack. She testified, after the claimant was in the hospital, that Mr. Haywood called about every day to check on his condition "and we talked."

Mr. Haywood admitted Mrs. Wilson told him the claimant had a heart attack, and when asked if she told him where the accident happened, said he did not recall whether she did or not. He was asked:

"Q. But you wouldn't say she didn't; is that right?

"A. I don't know if she—I don't recall if she told me where he had the heart attack.

"Q. Mr. Haywood, while Mr. Wilson was in the hospital approximately how many times would you say you conversed with Mrs. Wilson?

"A. Well, we checked almost every day to see how he was getting along.

"Q. Then you had knowledge during this entire period that he had suffered this heart attack; is that right?

"A. We were of the opinion, yes."

The foregoing and other supporting evidence in the record is sufficient to permit a finding that notice was given or that the respondent had actual knowledge of the accident, and the failure of the respondent to file its report with the commissioner within seven days after the receipt of such knowledge extended the time

within which claimant was permitted to commence a proceeding for compensation before the commissioner to one year.

The two proviso clauses in 44-557 were added by the 1957 legislature and became effective July 1, 1957. It is argued the effect of the ruling of the commissioner was to apply the proviso clauses retroactively to February 11, 1957.

This point was presented in *Pinkston v. Rice Motor Co.*, supra, which followed a previous decision, *Dobson v. Wilson & Co., Inc.*, 152 Kan. 820, 107 P. 2d 676. The section of the statute under consideration in the *Pinkston* case was G. S. 1949, 44-520a, which provided that written claim for compensation must be served upon the employer within eight months after the death of the injured employee if death results from the injury within three years after the date of the accident. This provision of the statute was in effect at the time of the accident, February 18, 1955, but the statute was amended by Laws of 1955, Chapter 250, Section 13 (G. S. 1955 Supp., 44-520a), effective May 1, 1955, extending the period to one year. Thereafter and on November 15, 1955, more than eight months after the date of the accident but within one year therefrom, a written claim for compensation was served. The court held the provisions as to the time of service was not a substantive part of the contractual relation, but was procedural and remedial in nature, and whether the claim was served in time was to be determined under the statute as amended.

Respondent argues, however, that in those cases the court was dealing with a procedural statute, but the amendments to Section 44-557 are changes in the substantive law, and are punitive, calling our attention to the fact this is a criminal statute. This point is not well taken. While the section of the statute in question does have a punitive provision for its enforcement, the change made by the amendment is a procedural change and is remedial. Prior to the amendment of 44-557, claimant had one hundred eighty days within which to commence his proceeding before the workmen's compensation commissioner. (G. S. 1957 Supp., 44-520a.) This period of time did not expire until after 44-557 was amended, effective July 1, 1957. Whether the proceeding was commenced in time must be determined under this section of the statute as amended.

We therefore conclude the claimant's written claim for compensation was filed in time.

Do ostensibly inconsistent positions taken by the claimant, prior

to the filing of his claim for compensation under the workmen's compensation act, alter the right of the claimant to recover workmen's compensation from the respondent?

There has been only one alleged accident—that of February 11, 1957. Based on this one incident, and prior to any claim for compensation, the respondent argues, the claimant recovered from two insurance companies on the grounds that his disability did not arise out of and in the course of his employment; he has been awarded a permanent pension by the Veterans Administration on the grounds of being "permanently and totally disabled"; he has collected back wages from his employer, the respondent, for work not performed on the grounds that he was not disabled and was fit to drive in interstate commerce but was wrongfully refused the right to do so. Now, by this proceeding before the workmen's compensation commissioner, the claimant has been awarded compensation on the grounds he suffered a disability that did arise out of and in the course of his employment and that he has been disabled since February 11, 1957.

Consideration of these claims is interwoven with the first two questions presented by the respondent.

By express mandate the commissioner in a workmen's compensation proceeding is not bound by technical rules of procedure (G. S. 1949, 44-523), and the commissioner is directed to *hear and determine the matters presented,* and to make findings or an award such as he shall determine *fair and equitable under the provisions of the act* (G. S. 1949, 44-522). The workmen's compensation act establishes a procedure of its own which provides a remedy that is substantial, complete and exclusive in compensation cases. (*Employers' Liability Assurance Corp. v. Matlock,* 151 Kan. 293, 98 P. 2d 456; and cases cited therein.)

On the basis of the foregoing mandate of the legislature and interpretation of the act, we shall consider the various claims in order, viewed as evidence before the commissioner, to determine whether as a matter of law there is any reason to deny compensation.

On February 17, 1957, a claim was filed with the Travelers Insurance Company. This is a group policy administered by the respondent for which deductions are made from the wages of the employee who participates individually on a voluntary basis. The conditions for payment under this policy are that the disability

does not arise out of and in the course of employment. Payment was made on the basis of Dr. Hopper's written statement on the application form that claimant's disability of February 11, 1957, did not arise out of his employment.

The evidence is that claimant was in the hospital at this time (six days after the accident) and his wife was informed by the respondent's agent, Haywood, of the existence of this policy of insurance. Mr. Haywood personally gave claimant's wife the forms upon which to present this claim. Under the policy claimant was paid a total of $325. While claimant's signature appears on the application form it was filled out in the handwriting of his wife, and by Dr. Hopper. The claimant does not remember signing it.

It can hardly be said the respondent's participation regarding this claim went as far as did the conduct of the employer in *Johnson v. Skelly Oil Co.*, 180 Kan. 275, 303 P. 2d 172, nevertheless the evidence would authorize a finding that respondent's participation and assistance was sufficient to preclude it from taking advantage of claimant's position. The most favorable circumstance for the respondent resulting from this claim was the statement made by Dr. Hopper that the disability due to injury or illness of the claimant did not arise out of his employment. This was a conclusion inconsistent with the facts concerning which Dr. Hopper testified at the hearing. It was entitled to such weight as the trier of the facts saw fit to give it.

On March 1, 1957, the claimant filed for and received insurance through the Teamster's Union. This insurance is payable only if the claim does not come under a workmen's compensation act and must be so certified by the local union agent. Before payment was made under this policy it was necessary that the respondent complete a portion of the form relative to the application for insurance. Mr. Haywood testified he completed section three of the form which was sent to him by the union representative. The only place on the form in which inquiry is made concerning whether the accident is covered by the workmen's compensation act is in section three. The question is: "Has claimant filed a claim for benefits under Workmen's Compensation?" Presumably Mr. Haywood answered this in the negative. The form was returned by Mr. Haywood to the local union representative who then certified over his signature at the bottom of the form that the claim did not come under the workmen's compensation act.

Here again it may be said the evidence was entitled to such weight as the trier of the facts saw fit to give it.

Effective April 23, 1957, claimant was awarded a monthly pension by the Veterans Administration on the basis of disabilities "which are considered to be permanently and totally disabling."

The claimant was asked whether there was a hearing for the benefit determined by the Veterans Administration. He answered:

"No, no other than the veteran man here in Emporia. The main reason for that was, he come to my house and seen what kind of condition we was in, and I had two girls, and he did that to help me along."

Upon the evidence appearing in the record, it does not appear that claimant's position with respect to this disability pension is inconsistent with his claim for workmen's compensation.

After the claimant was sent home by Mr. Haywood on the 12th day of August, 1957, he waited around for more than two months and heard nothing from the respondent. He then went to his Teamster's representative, Mr. LaRue Moore, to see what could be done relative to getting back on the job. The union representative, armed with the two releases given the claimant by Dr. Hopper and Dr. Eckdall, filed a claim for back pay commencing August 12, 1957. This claim was based on allegations that claimant was fully recovered from all disabilities and also that he was physically fit and able to drive a truck in interstate commerce. As a result of a hearing held on October 17, 1957, before the joint labor board in Kansas City, Missouri, the respondent was ordered to and did pay back wages to the claimant in the amount of $823.68 for the period of August 12, 1957, to October 10, 1957, and reinstated the claimant in his employment.

Pursuant to this reinstatement order of the labor board, claimant worked for fourteen days subsequent to October 17, 1957. He was then referred to and examined by Dr. Calovich on October 23, 1957, and found unfit to drive a vehicle in interstate commerce. Thereupon the respondent gave him written notice dated November 7, 1957, of removal from service as not being physically qualified.

On the surface it would seem rather harsh to permit a claimant to recover workmen's compensation from his employer after prosecuting, through his union representative, a claim for back pay as above stated. However, the facts originally stated were extended in great detail to show the conduct of the respondent which assisted in bringing about conditions which forced this claim. Dr. Eckdall,

the contract doctor for the respondent, gave claimant an absolute release as heretofore reported on the 181st day after the accident. In this release Dr. Eckdall did not indicate there was any limitation upon claimant's capacity to work. It could fairly be said the respondent brought this dilemma upon itself by the conduct of its own doctor. Furthermore, after the claimant was returned to work on the 12th day of August, the respondent did not immediately refer him to Dr. Calovich for examination but delayed matters until after the claimant sat around for approximately two months, when he went in desperation to his union representative. Only after the respondent was ordered by the labor board to pay back wages did the respondent refer the claimant to Dr. Calovich for examination. The trier of the facts was entitled to weigh this evidence.

On the 7th day of November, 1957, claim was again filed for reinstatement and back pay through claimant's Teamster Agent, Mr. LaRue Moore, on the grounds that claimant was fit and able to work. The hearing was set for December 13, 1957, before the labor board but was withdrawn on that date due to the pendency of this workmen's compensation claim, which was filed with the respondent on November 21, 1957, on the grounds that claimant was totally disabled from an accident suffered on February 11, 1957.

In view of the foregoing and the withdrawal of the second claim for reinstatement, we think this claim merits no further attention.

It cannot escape notice that claimant did file inconsistent claims. Yet he was an employee with only an eighth grade education who did not know there even existed workmen's compensation for injury arising out of and in the course of his employment. The record clearly reflects that claimant had no fraudulent intent or scheme in mind by the various claims. On the contrary, he was determined to get back on the job at which he earned slightly more than $100 per week, so he could support his wife and minor children. It was not until the claimant finally went into the office of Wade A. Myers, an attorney at Emporia, that he was advised of workmen's compensation. This was on the 19th day of November, 1957. After an independent investigation and consultation with the doctors, his attorney found it necessary to convince the claimant that he was permanently disabled and that he should proceed for workmen's compensation. It could hardly be urged by an employer that an employee was qualified to determine his own physical fitness to drive in interstate commerce.

This case illustrates the need for requiring the employer to serve notice of an accident with the commissioner under the workmen's compensation act pursuant to 44-557, *supra*. When a report is filed by the employer, the commissioner sends a post card to the employee notifying him that he may have certain rights under the Kansas workmen's compensation laws. Under normal circumstances the employee would then check to determine whether he had rights under the workmen's compensation act. The notice given by the employer is not a document which binds the employer to pay compensation. These reports cannot be considered as evidence before the commissioner or any court.

Upon all the facts and circumstances presented by the record, we cannot say the trier of the facts erred in finding that inconsistent claims made by the claimant were neutralized by activity or participation on the part of the respondent relative to such inconsistent claims. The evidence, as a matter of law, supports the findings and the award.

The judgment of the lower court is affirmed.