No. 42,143

Elsa A. Rorabaugh, widow, and Guardian of Gene L. Rorabaugh, Sheryl L. Rorabaugh, Daryl L. Rorabaugh, Jeffrey L. Rorabaugh, Gerald L. Rorabaugh and Christopher L. Rorabaugh, Minors (Willard Bennett Rorabaugh, deceased), *Appellants*, v. General Mills, Incorporated, Respondent, and Travelers Insurance Company, Insurance Carrier, *Appellees*.

(356 P. 2d 796)

Opinion filed November 12, 1960.

*Bob H. Newton,* of Anthony, argued the cause, and *J. Howard Wilcox,* also of Anthony, was with him on the brief for the appellants.

*Robert J. Hill,* of Wichita, argued the cause, and *Wayne Coulson, Paul R. Kitch, Dale M. Stucky, Donald R. Newkirk, Gerrit H. Wormhoudt, Philip Kassebaum, John E. Rees, Robert T. Cornwell* and *Willard B. Thompson,* all of Wichita, were with him on the brief for the appellees. *Hugo T. Wedell* and *Homer V. Gooing,* both of Wichita, of counsel.

The opinion of the court was delivered by

SCHROEDER, J.: This is an appeal in a workmen's compensation case wherein the appellants seek review of the decision of the district court denying them an award sought upon the death of Willard B. Rorabaugh, their husband and father, who died of a coronary occlusion caused by thrombosis on May 19, 1958, in Wichita, Kansas, while in the employ of the appellee, General Mills, Incorporated, of Minneapolis, Minnesota.

The sole question, as stated by the appellants, is whether Willard B. Rorabaugh met with personal injury by accident *arising out of and in the course of his employment* resulting in his death.

The commissioner found in the affirmative on the above question and awarded compensation to the claimants. On appeal the district court of Sedgwick County found the cause of the decedent's death was a coronary occlusion caused by thrombosis and denied compensation, the reasons being set forth in the journal entry as follows:

"Second, that the court is unable to determine from the evidence whether or not the decedent's coronary occlusion arose out of his employment or whether or not there was a causal relationship between decedent's employment and the coronary occlusion he sustained.

"Third, That as an inescapable result of the above findings of fact, the court must and does hereby hold as a matter of law that Claimants have not sustained their burden of proof, that it has not been established that the decedent met his death by personal injury by accident arising out of and in the course of his employment."

All facts have been stipulated by the parties except those which relate to the issue heretofore stated, and the evidence on this point was presented by the deposition testimony of two doctors, one for the claimants and the other for the respondent and its insurance carrier.

It was stipulated that the Sedgwick County coroner would testify the decedent died of a coronary occlusion caused by thrombosis and that no autopsy was performed. On May 19, 1958, the decedent went to work for the respondent at approximately 8:00 a. m.,

such work consisting of loading a railroad box car with 100-pound sacks of seed, such sacks being carried into the box car on a conveyor belt from which the decedent took them manually and stacked them in the box car; that during the morning of May 19, 1958, the decedent had a 10 to 15-minute coffee break; that on said date he clocked out on a time clock for his lunch hour at 11:55 a. m.; that he went across the street to a cafe; that he returned to the premises of the respondent within approximately five minutes, where he became very ill, vomited and had to be placed on a table; that while on the table he complained of sharp pains in his chest; that an ambulance was called at approximately 12:05 p. m., in which the decedent was taken to the hospital. He was found to be dead on arrival at the hospital at approximately 12:28 p. m. The decedent was survived by his wife and six minor children, all of whom were dependent upon the decedent and are claimants in this action, the children appearing by and through their mother as guardian.

While the appellants have stated the sole question as heretofore related, they specify that (1) the judgment of the district court is not supported by the evidence, and (2) the judgment of the district court is contrary to the evidence. Both are recognized by the appellants as questions of law upon which this appeal is to be determined. (*Fair v. Golden Rule Refining Co.*, 134 Kan. 623, 7 P. 2d 70; and *Brandon v. Lozier-Broderick & Gordon*, 160 Kan. 506, 163 P. 2d 384.)

A study of the appellants' brief indicates what they are really seeking is not a determination that the district court's judgment is unsupported by and contrary to the evidence, but a determination of a question of fact—a determination that decedent's death was causally related to his work. The real issue on this appeal, therefore, is whether this court can properly say, as a matter of law, the district court was compelled to find the decedent's death was causally related to his employment.

This was the situation presented in *Beaver v. Tammany Industries*, 180 Kan. 440, 304 P. 2d 501, where the decedent's death resulted from a coronary occlusion, the attack occurring while he was on the job. Compensation was awarded the widow by the commissioner, but on appeal the district court denied compensation upon finding that the evidence failed to prove the deceased sustained a personal injury by accident, arising out of his employment, which

resulted in his death. The trial court stated to claimant's counsel at the time the appeal was argued:

"'. . . You didn't show any connection with the employment and the evidence that the strain from his work precipitated his attack was very questionable.'" (p. 441.)

On appeal to the Supreme Court it was stated:

"We have many times held that whether a judgment is supported by substantial, competent evidence is a question of law as distinguished from a question of fact. (See *Hill v. Etchen Motor Co.,* 143 Kan. 655, 56 P. 2d 103.)

"Actually the effect of claimant's argument is that we should consider the claimant's evidence, especially that of the doctor, and conclude that it compels as a matter of law a finding deceased sustained personal injury by accident arising out of his employment, which resulted in his death. In view of this entire record and all the surrounding facts and circumstances, we cannot reach such a conclusion . . .

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"The only question we have is whether there was substantial evidence to sustain the trial court's finding that the evidence failed to prove that deceased sustained personal injury by accident arising out of his employment." (pp. 443, 444.)

The jurisdiction of the Supreme Court on appeal in a workmen's compensation case is specifically limited to the determination of questions of law. As to questions of fact this court reviews the record only to determine whether it contains substantial evidence to support the trial court's finding, and in so doing, all the evidence is reviewed in the light most favorable to the prevailing party below. If substantial evidence appears such finding is conclusive and will not be disturbed on review. (*Madison v. Key Work Clothes,* 182 Kan. 186, 318 P. 2d 991; *Kafka v. Edwards,* 182 Kan. 568, 322 P. 2d 785; and cases cited therein.)

The court does not review the record to ascertain whether it contains evidence to support a contrary finding, but only whether there is substantial competent evidence to support the finding made by the district court. (*Angleton v. Foster Wheeler Construction Co.,* 177 Kan. 134, 276 P. 2d 325; and *Wilson v. Santa Fe Trail Transportation Co.,* 185 Kan. 725, 347 P. 2d 235.) Furthermore, on appellate review this court is not concerned with the findings of the commissioner, but only with the findings of the district court where the case is tried *de novo.* (*Burns v. Topeka Fence Erectors,* 174 Kan. 136, 254 P. 2d 285; *Davis v. Haren & Laughlin Construction Co.,* 184 Kan. 820, 339 P. 2d 41; and *Wilson v. Santa Fe Trail Transportation Co.,* supra.)

The workmen's compensation act prescribes no standard of health for a workman, and if his physical structure gives way under the stress of his usual labor his death or injury is *an accident* which arises out of his employment. This rule is also applicable to "heart" cases. It has been held that a coronary thrombosis (*Peterson v. Safeway Stores*, 158 Kan. 271, 146 P. 2d 657; and *Hill v. Etchen Motor Co.*, 143 Kan. 655, 56 P. 2d 103), or an acute coronary occlusion (*Pinkston v. Rice Motor Co.*, 180 Kan. 295, 303 P. 2d 197; and *Alpers v. George-Nielsen Motor Co.*, 182 Kan. 790, 324 P. 2d 177), which resulted in the death or disability to a workman, was personal injury *by accident* when it arose out of and was received in the course of employment. (*Alpers v. George-Nielsen Motor Co.*, supra; and *Wilson v. Santa Fe Trail Transportation Co.*, supra.)

Under the workmen's compensation act the rule is that the injury arises *out of the employment* when there is apparent to the rational mind, upon consideration of all the circumstances, *a causal connection between the conditions under which the work is required to be performed and the resulting injury.* (*Carney v. Hellar*, 155 Kan. 674, 127 P. 2d 496; *Pinkston v. Rice Motor Co.*, supra; *Alpers v. George-Nielsen Motor Co.*, supra; and *Wilson v. Santa Fe Trail Transportation Co.*, supra.)

The rule that this court will review all of the evidence in the light most favorable to the prevailing party below, and affirm the trial court's judgment, if there is any evidence which supports it, applies with equal force whether compensation has been allowed or denied by the trial court. Coronary accident cases, applying these rules where compensation was denied, are *Beaver v. Tammany Industries*, supra; *Kafka v. Edwards*, supra; and *Grow v. Musgrove Petroleum Corp.*, 184 Kan. 800, 339 P. 2d 75. Coronary accident cases, applying these rules where compensation was awarded, are *Hill v. Etchen Motor Co.*, supra; *Pinkston v. Rice Motor Co.*, supra; and *Alpers v. George-Nielsen Motor Co.*, supra.

The foregoing rules have been stated many times, and this case is not of interest because of their summarization herein, but in their application to the facts and circumstances presented by the evidence set forth in the record.

The decedent was not a patient of either Dr. Hiroshi Yasuda, a practicing physician in Anthony, Kansas, who gave deposition testimony for the claimants, or of Dr. Charles L. Williams, a practicing physician specializing in internal medicine in Wichita, Kansas, who gave deposition testimony for the respondent and insurance

carrier, and neither of the doctors knew or had seen the decedent as a patient during his life. Both qualified as medical doctors to testify as experts. Dr. Yasuda's experience with heart disease included himself as one who suffered from the disease and by reason of which he made a special study of heart disease. He was regularly licensed to practice medicine and practiced in the State of Kansas for twenty-two years. Dr. Williams was a regularly licensed and practicing physician in the State of Kansas for twelve years. His experience with heart disease, since specializing in internal medicine, comprised some fifty per cent of his practice.

Dr. Yasuda was asked a hypothetical question as follows:

"Now, Doctor, assuming that a man approximately forty-five years of age and apparently in normal health was working in a box car, loading one hundred pound bags of flour, for a period of approximately four hours, with a rest break for approximately ten minutes at 10:00 o'clock, and who had been similarly employed for a period of approximately six years; that within ten minutes after checking out for lunch he became seriously sick and thereafter vomited and became weak and then unconscious and within fifteen or twenty minutes died, would you, as a doctor, have an opinion as to what caused his death?"

to which he answered:

"Well, *I cannot answer definitely but I presume* he died from a coronary heart disease." (Emphasis added.)

Dr. Yasuda was then asked for an opinion within reasonable medical probability, and he gave as his opinion that the decedent died from an acute coronary heart disease, called a coronary occlusion.

Assuming the same state of facts, including the fact that the decedent experienced pain in his chest, Dr. Yasuda was asked whether or not the death was caused by the stress of the decedent's labor. His opinion, within reasonable medical probability, was that the decedent probably died from an acute coronary heart disease due to the stress of his work.

A similar hypothetical question, confined more carefully to the stipulated facts, was put to Dr. Williams who answered that in his opinion the probable cause of death was a coronary thrombosis, but there might have been a possibility of another cause. Upon the same hypothetical question Dr. Williams stated, in his opinion, the work of the decedent did not have any relation to the cause of death.

In support of Dr. Williams' opinion he testified in substance that a coronary thrombosis develops first of all in a diseased artery, the

disease referred to being arteriosclerosis. Such disease occurs fairly early in life and to a greater extent in some than in others. It is characterized by the deposition of fatty substances and certain other substances within the walls of the artery. Throughout the years these substances build up to a point where the obstruction may be attained just by the progression of this disease, progressively narrowing the channel of the artery. Or commonly the artery will become obstructed by what is termed a "coronary thrombosis," in which there is a sudden development of a clot in the artery. This clot is usually initiated by something taking place in the diseased wall of the artery, either an ulceration beneath one of these fatty plaques that lifts it up and slows the blood down and sets the stage for a blood clot to form right at that point at that time, or by some similar process in which a sudden occlusion of the vessel is achieved.

Dr. Williams was then asked:

"Q. Now, does medical science, at the state it is now, know with any degree of certainty what actually causes a thrombosis to form?

"A. No, that has been probably our field of greatest deficit in cardiovascular disease. In recent years great strides have been made in various aspects of coronary artery disease, but this is one area in which we still are lacking in knowledge.

.  .  .  .  .  .  .  .  .  .  .  .  .  .

"Q. Is there anything in the state of your knowledge about the formation of these thrombus or thrombi—is that the plural?

"A. Thrombi is plural.

"Q. —that would in any way indicate that exertion of a patient is related to or in any way causes the formation of the thrombus?

"A. None that I know of at all. The majority of the attacks of coronary thrombosis certainly do not occur during times of physical activity at all. They occur—the greatest majority of them occur in individuals doing nothing. Frequently, very frequently, they occur during sleep, so there is no relationship of the appearance of this complication to that."

In explanation of Dr. Williams' opinion that the work of the decedent had no relation to the cause of death, he testified as follows:

"I feel that this gentleman, assuming that he had died of a coronary occlusion due to coronary thrombosis, has had arteriosclerosis heart disease, even though he had no symptoms of it, for some undetermined period of time prior to this. I do not feel that what he was doing physically actually precipitated the appearance of the complication of the thrombosis in the individual. Why these things occur, I don't know, no one knows why they occur at times, and, as I say, this complication occurs most commonly when

an individual is not doing physical, strenuous physical activity. So I don't feel that the effort that he had been doing had anything to do with the actual appearance of this complication of the thrombosis."

Dr. Williams then covered the only logical way, in his opinion, work could be related to heart damage by testifying:

". . . Now, certainly one could assume, and this is entirely assumption, that this individual were having chest pain, we don't know what the history is of this man, but assuming he were having chest pain and had not actually had an infarction occur, a thrombus occur, and this individual, assuming he were going right ahead doing his heavy physical work in which certainly the demand upon the heart muscle is greater than it is at rest, and he is exerting this demand at a time when the blood flow to the heart muscle is being impaired by insufficient flow through the coronary arteries, without thrombosis, if the extended energy is carried on during that time, certainly the heart muscle that is suffering from lack of oxygen is I think damaged to a greater extent, a greater amount of muscle may be involved in that, and that individual could do himself damage by continuing to exert under those conditions."

Now turning to the cross examination of Dr. Yasuda, we find the appellants in their brief have ignored all of the speculation, conjecture and doubts revealed by his testimony. Dr. Yasuda readily conceded that the occlusion (heart attack) was probably caused by a thrombosis (a clot that forms at the site of the occlusion), and that "the work itself" is not related to and has nothing to do with the formation of a thrombosis. He testified:

"Q. Doctor, is it your opinion that work is in any way related to the formation of a coronary thrombosis?

"A. The heart disease itself probably predisposes the coronary thrombosis but general work, no. I am thinking of the general definition of thrombosis. It is a clot.

"Q. It is a clot that forms at the scene of the place where the vessel is occluded?

"A. That's right.

"Q. And work has nothing to do with the form, either of the heart disease or the form of the clot, is that right?

"A. The work itself, no.

.    .    .    .    .    .    .    .    .    .    .    .    .    .

"Q. Isn't the best medical opinion of people who study these things that a thrombosis clot forms in a matter of minutes?

"A. Yes.

"Q. What is your best opinion as to how fast a clot normally will form, a thrombosis?

"A. Well, *I myself have no idea how fast those clots form.* I haven't done any research work to that extent." (Emphasis added.)

Dr. Yasuda further conceded that where a person has a coronary thrombosis the thing that causes his injury, and if severe enough

his ultimate death, is the occlusion of the coronary vessel by the thrombosis. This, he conceded, prevents a blood supply getting to the heart through the occluded vessel; that blood carries for one thing oxygen which the heart needs; and that by reason of such failure of blood supply to the heart the heart muscles, or tissue, die and the heart will not function. He further conceded there is no damage to the heart prior to the occlusion and that it is the damage to the heart which causes the death. He further conceded there cannot be any damage to the heart, which may result in death, until the thrombosis is formed.

Dr. Yasuda admitted that "Probably, considering his age, he [the decedent] had a sclerotic artery which helped to form the clot, but that is not the absolute answer. He could have had a spasm of the blood vessel, too."

Dr. Yasuda had previously testified that work is not directly responsible for the clot, but considering his experience, he would say the work has contributed to the formation of the clot indirectly, not directly. He explained this by saying the stress and strain of work sometimes causes *injury* to the coronary vessel, whether it is a sclerotic blood vessel or a normal blood vessel, which results in the formation of a clot. But he *would not state* that an injury to the coronary blood vessel was *the probable cause* of the decedent's coronary thrombosis and his resulting death.

He further explained how work might indirectly contribute to the formation of a clot by stating that the increased demand for blood, caused by the stress and strain of his work, could cause the coronary blood vessel to go into a spasm and decrease the blood supply, which in turn would cause the formation of a clot and the resulting death. But here again he *would not state* that a spasm of the coronary vessel was *the probable cause* of the decedent's coronary thrombosis and his resulting death.

Therefore, the only other testimony relating to a condition which could cause the decedent's coronary thrombosis and his resulting death was that of a sclerotic, or diseased, artery in which the stress and strain of work is not known to contribute to the formation of the clot, absent an injury to the coronary vessel (ruled out as an improbability by Dr. Yasuda).

The cross examination of Dr. Yasuda is summarized by the following testimony:

"Q. Now, Doctor, let me ask you this question: If in fact this man didn't have either a spasm of the coronary vessel involved or he didn't have the

work some way cause an injury to his vessel like we have just been talking about, and his thrombosis, therefore, simply was a spontaneous formation of the kind we frequently have in a sclerotic blood vessel, if you assume those things, Doctor, then there would be no relation between the work and this man's thrombosis and his resulting heart damage and death, would there?

"A. I still go back to my assumption. I cannot say whether the work absolutely did or not. I have to go on other cardiac specialists' opinions.

"Q. But if you make these assumptions that I asked you to make, your answer would be that there wouldn't be any relation, wouldn't it?

"A. That's right."

On the basis of the evidence presented by the record herein, including the foregoing unequivocal admissions, it logically follows that no causal relation between the stress and strain of work and the decedent's thrombosis, with resulting heart damage and death, has been shown, unless the thrombosis occurred while the decedent was working. Therefore, if the thrombosis (which work does not cause to form) does not occlude the coronary blood vessel (thereby shutting off the blood supply to the heart) until after a person stops working, the stress of work cannot aggravate or accelerate the heart damage resulting from lack of blood supply.

Dr. Yasuda admitted the best medical opinion is that a thrombosis forms in a matter of minutes, but when asked how rapidly a severe or acute thrombosis would build up, one which would cause death (of significance in the case presently before the court), he stated he did not have any idea. Thus, Dr. Yasuda's opinion on direct examination was not based upon probability.

It is apparent from the record herein that the trial court's findings were sustained by substantial competent evidence.

The appellants have cited *Winkelman v. Boeing Airplane Co.*, 166 Kan. 503, 203 P. 2d 171, for the proposition that it cannot be said which sack of seed lifted by, or step taken by, the decedent caused the particular breakdown of his coronary vessel. They also cite *Gilliland v. Cement Co.*, 104 Kan. 771, 180 Pac. 793, for the proposition that the evidence shows conclusively the physical structure of the man's heart gave way under the stress of his labor. For the reasons heretofore stated these cases have no application to the facts and circumstances presented by the record herein on the point for which they are cited.

The appellants contend whether there was a former arteriosclerosis, what triggered it off, or how slowly or rapidly, is immaterial; if the coronary accident happened while the decedent was working and under stress of normal labor, the burden of proof

has been met, there being no evidence to the contrary. Therefore, they argue, the judgment is not supported by the evidence and is contrary to the evidence, citing *McMillan v. Kansas Power & Light Co.*, 157 Kan. 385, 139 P. 2d 854 (dissenting opinion); and *Pinkston v. Rice Motor Co.*, supra. For reasons heretofore stated this argument lacks merit. The burden of proof was upon the claimants to show a causal connection between the conditions under which the work was required to be performed and the resulting injury. In this they have failed.

The judgment of the trial court is affirmed.

WERTZ, J. (dissenting): From a careful review of the record I am of the opinion that the trial court's judgment is wholly contrary to, and is not sustained by, any competent evidence and such judgment should be reversed.

ROBB, J., joins in the foregoing dissenting opinion.